### Marie L. BLACK and David Black, Plaintiffs,

v.

### COLUMBUS PUBLIC SCHOOLS, Defendant.

#### No. C2–96–326.

United States District Court,
S.D. Ohio,
Eastern Division.

Dec. 22, 2000.

Bennie Eugene Espy, Ben Espy Company, L.P.A., James Craig Lee, Christopher King, Columbus, OH, for Plaintiffs.

John Curtis Albert, Francesca Tosi Ward, Crabbe Brown Jones Potts & Schmidt, Gregory Bradford Scott, Scott Scriven & Wahoff, Columbus, OH, for Defendant.

## *MEMORANDUM AND ORDER*

HOLSCHUH, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (Record 31). Plaintiff Marie L. Black asserts eleven claims against Defendant, Columbus Public Schools ("CPS"), arising from her employment with CPS. Plaintiff alleges that she was subjected to a hostile work environment because of her supervisor's conduct, and that as a result of her complaints about his conduct, she suffered retaliation. Plaintiff further alleges that she was subjected to disparate treatment based on sex, race and age. Additionally, Plaintiff asserts that Defendant violated rights guaranteed to her by the First, Fifth and Fourteenth Amendments to the United States Constitution, as well as rights protected under Ohio law. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.*, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et. seq.*, 42 U.S.C. § 1983, the Ohio Civil Rights Act, Ohio Revised Code Chapter 4112, Ohio Revised Code § 4113.52, and Ohio tort law. Plaintiff's husband, David Black, asserts two claims under Ohio tort law. For the following reasons, the Court **GRANTS** Defendant's motion in part, and **DENIES** the motion in part.

## I. FACTUAL BACKGROUND

Plaintiff began her career with Columbus Public Schools in 1965. From 1987 to 1992, Plaintiff served as Assistant Principal at Mifflin Alternative Middle School. During Plaintiff's tenure as Assistant Principal, the school's Principal was Stephen Tankovich. Until 1991, Plaintiff and Tankovich had a good working relationship (Black Dep. at 28, 31; Tankovich Dep. at 19). However, Plaintiff alleges that during the 1990–91 school year, an affair began between Tankovich and a parent volunteer, Cynthia Stanley (Black Dep. at 25).[1] Plaintiff asserts that the alleged affair rendered the school office a sexually charged environment which unreasonably interfered with her work performance.

Plaintiff offers several incidents to demonstrate how the alleged affair affected the office and created a hostile work environment. Plaintiff asserts that she witnessed hand holding, kissing and touching between Tankovich and Stanley.[2] (Defen-

---

1. Both Tankovich and Stanley deny that they were having an affair at this time, and both were married at this time. However, Tankovich and Stanley began dating in 1995 after Tankovich was separated from his wife and Stanley was divorced from her husband. They married in 1996. Tankovich denies any romantic relationship with Stanley during the time period the Plaintiff worked at Mifflin. (Defendant's Motion for Summary Judgment at 6, n.1).

Stanley volunteered at the school approximately four days per week, and was involved in a variety of activities. (*See* Defendant's Responses to Plaintiff's Second Set of Inter-

rogatories, Motion for Summary Judgment, Exhibit L.)

2. In her Memorandum Contra (Record 34), Plaintiff asserts that she witnessed "hand holding, kissing, and touching" between Tankovich and Stanley during school hours. (Memorandum Contra at 22). However, Defendant correctly points out that in Interrogatory No. 5 in Defendant's Second Set of Interrogatories to Plaintiff, attached to Defendant's Motion for Summary Judgment as Exhibit G, when asked to state the specific nature of the sexual conduct she observed, Plaintiff responded, "Holding hands, jokes, sitting on

dant's Motion for Summary Judgment at 4, Plaintiff's Memorandum Contra at 22). Plaintiff's secretary, Pat Bryson, and another parent volunteer, Arnon Lee, state that although rumors abounded about the alleged affair, they never witnessed any sexual conduct between Tankovich and Stanley (Bryson Dep. at 17–18, 22, 43, 45; Lee Dep. at 18–19, 22–23, 26, 43). Plaintiff also alleges that Tankovich and Stanley were often in Tankovich's office for lengthy periods of time with the door locked, and would emerge from the office with their clothes rumpled. (Plaintiff's Memorandum Contra at 2). Tankovich acknowledges that Stanley was in his office on various occasions, and that she did sit on or lean against his desk because of back problems. (Tankovich Dep. at 27). Tankovich also acknowledges that he closed and locked the door for privacy occasionally when Stanley was in his office, because he "didn't want someone to have an inappropriate concept of what was going on." (Tankovich Dep. at 27, 50). Tankovich frequently locked his office door when he did not want to be interrupted during conferences with teachers and parents. (Tankovich Dep. at 49–51). Tankovich denies that anything sexual in nature occurred between himself and Stanley during the school day during the 1991–92 school year. (Tankovich Dep. at 27–28).

Plaintiff asserts that Tankovich allowed the affair to consume most of his time at school, and as a result, he abdicated many of his duties, thereby leaving her to shoulder undue disciplinary responsibility. (Black Dep. at 29). In addition, Plaintiff asserts that she had to field complaints from staff members regarding the affair and Tankovich's corresponding unavailability, (Black Dep. at 32, 65), from Tankovich's wife about her husband's unavailability, (Black Dep. at 50), and on one occasion, had to explain to Stanley's child why the child had to wait so long while her mother was in the principal's office. (Plaintiff's Memorandum Contra at 2, 22).

Plaintiff argues that Tankovich's conduct adversely affected her job performance (Black Dep. at 56), created an environment which was not conducive to administering a school, (Black Dep. at 56), and offended her personally.[3] However, Plaintiff does not allege, and the record is clear, that no direct sexual harassment of Plaintiff by Tankovich ever occurred. (Defendant's Motion for Summary Judgment at 5; Black Dep. at 61–62).

In the Spring of 1991, Plaintiff reported the rumored affair to Mifflin's Community of Schools Leader (COSL) Maurice Blake.[4]

---

Mr. Tankovich's lap." She did not state that she witnessed kissing, as she does now in her Memorandum Contra.

3. *See* Black Dep. at 63–64:

A: [I]f sex at the work place has any place at all, then it throws me back to the womb. And in throwing me back to the womb, I mean to say that there was not much for me to learn because I've come equipped. So I mean to say that years and years of education and years and years of holding to values and principals [sic] and what's good for people and good for children and maintaining a healthy lifestyle, we are wiped away.
Q: So you were offended personally because of the affair that was going on between Mr. Tankovich and Ms. Stanley?
A: Very definitely. And it affected my job in such a way that I could not overcome it.

Q: It offended you personally because it was against your upbringing; is that correct?
A: Not necessarily mine. There are creeds and beliefs and standards that the schools are run on. There are standards of morale and morality and leadership and judgment, effectiveness, and quality. It was just absolutely contrary to anything that I had been trained for or trained to believe in. In addition to my home environment, the school environment, the district environment professes a whole other slate. (Black Dep. at 63–64).

4. A Community of Schools Leader (COSL) is an employee of the Columbus Public Schools who is responsible for supervising building principals in a defined geographic region. Additionally, a COSL is responsible for monitoring academic achievement levels, ensuring that the appropriate climate exists within

(See Plaintiff's Memorandum Contra at 15, Defendant's Motion for Summary Judgment at 5). Plaintiff and Blake discussed both the affair and the amount of disciplinary matters that Plaintiff was handling. (See Defendant's Motion for Summary Judgment at 5). In response to Plaintiff's concerns, Blake investigated the matter further and found that Plaintiff was handling an "inordinate amount" of the school's disciplinary matters. (Blake Dep. at 24). Blake discussed Plaintiff's concerns with Tankovich, and as result, Tankovich assigned support staff to assist Plaintiff with her disciplinary duties. (Tankovich Dep. at 24–25). Blake did not make a report about or document these meetings in any manner, nor did he do so for any of Plaintiff's subsequent complaints and his meetings with her. (Blake Dep. at 36, 52, 72, 75).

Blake met with Tankovich twice to address his unavailability and the alleged affair. (Blake Dep. 37, 39–40, 43–44). During the first meeting, Blake told Tankovich that the staff was concerned that Stanley was spending too much time in Tankovich's office. (Blake Dep. 39). Blake instructed him to be sure that the time he spent with Stanley would not interfere with his duties as Principal. (Blake Dep. at 39). During his second meeting with Tankovich, Blake asked Tankovich about the alleged affair. (Blake Dep. at 44). Tankovich denied having an affair with Stanley. (Blake Dep. 44). Blake met with Stanley to discuss the alleged affair, and she also denied the allegation (Blake Dep. at 47).

In the spring of 1992, Plaintiff received notice that she was being transferred, effective for the 1992–93 school year, to Yorktown Middle School, where she would serve as the assistant principal. (Black Dep. at 57; Blake Dep. at 55–57). Plaintiff did not request this transfer. (Black Dep. at 59; Blake Dep. at 57). In fact, she had previously been offered and declined two lateral transfers, and had informed Blake that she was interested in a promotion, not a lateral transfer (Black Dep. at 59; Blake 56).

Plaintiff asserts that her transfer to Yorktown Middle School was, in fact, a retaliatory demotion. First, Yorktown was not an alternative school, as was Mifflin, and thus was considered to be less prestigious (See Plaintiff's Memorandum Contra at 16). Plaintiff points to the manner in which positions in the school district are filled to support this argument. In the school district, openings at regular schools are filled through an informal process. (Black Dep. at 117–18; Blake Dep. at 59; Waddell Dep. at 16, 18, 19). The openings are not posted, and no formal application is made. Instead, an individual wishing to be promoted or transferred fills out preference sheets from her COSL indicating her general interests, if that process is used by her COSL, or informs her supervisors, COSLs, and colleagues that she is interested in a particular position or a certain type of position, and hopes to be recommended for such. (Waddell Dep. at 18–19). In contrast, openings at alternative schools are posted, and candidates go through a formal application process. (Waddell Dep. 18–19; Black Dep. at 117–19). Plaintiff argues that her talents and background in foreign language education made her particularly well-suited to serve as assistant principal at Mifflin, because the school had a foreign language and international studies focus. (Plaintiff's Memorandum Contra at 27). Plaintiff objected to the transfer to Yorktown, but she had no choice as to whether to accept it. (Blake Dep. 57).

Second, Plaintiff argues that her transfer to Yorktown was a retaliatory demotion because of a conversation she allegedly had with Blake regarding her transfer. According to Plaintiff, Blake informed her that she would be transferred, and then

schools, and selecting and assigning administrators within the region. These duties include evaluating building principals, and en-suring that the school principals follow school policy. (Blake Aff. ¶ 3; Stamps Aff. ¶ 3; Blake Dep. 9–11; Waddell Dep. at 9).

said, "you've been talking to everybody about what was going on over here ... it's too bad you didn't talk loud enough" (Black Dep. at 58).

CPS asserts that Plaintiff was transferred to Yorktown because the school had an open position for which Plaintiff was qualified, and because the position's duties would accommodate her concerns about student discipline. Yorktown had a smaller student population, and thus would require less disciplinary responsibility of Plaintiff. (Defendant's Motion for Summary Judgment at 7). CPS offers the testimony of Gregory Waddell, the COSL for Yorktown, that at a COSL meeting, he announced that he needed to fill the Yorktown position with an experienced administrator who was a black female, and preferably had a "strong curriculum background." (Waddell Dep. at 17). Blake, Plaintiff's COSL, recommended her for the position because he thought the duties of the position better fit Plaintiff's needs and would help her get away from the environment at Mifflin about which she was complaining. (Blake Dep. at 65, 67). However, Blake informed Waddell of Plaintiff's concerns and complaints regarding Tankovich prior to Waddell's announcement of the opening and Blake's recommendation of Plaintiff for the position (Blake Dep. at 66–67).

After Plaintiff was informed of her transfer to Yorktown, she continued to contact school officials and administrators about the environment she perceived to exist at Mifflin, as well as her allegedly retaliatory transfer. In addition to Mifflin COSL Blake and Yorktown COSL Waddell, Plaintiff expressed her concerns to Superintendent Larry Mixon, Deputy Superintendent Joyce Beltz, school board member William Moss, and Central Education Center employee Lou Mazzoli, in addition to many others. (Plaintiff's Memorandum Contra at 16–18; Defendant's Motion for Summary Judgment at 8; Black Dep. at 66–86; Blake Dep. at 64).

In June 1992, Plaintiff wrote a letter to Deputy Superintendent Joyce Beltz, expressing her concerns about the environment at Mifflin, as well as her transfer to Yorktown (Blake Dep. at 59, 65; Black Dep. at 74–76). Plaintiff also showed this letter to Blake and Mazzoli (Black Dep. at 75–76).

Although the record is not clear as to when, at some point COSL Blake met with Superintendent Mixon and informed him of the allegations of an affair between Tankovich and Stanley. (Blake Dep. at 53–54). Also, at some point, Superintendent Mixon requested a meeting with COSL Waddell regarding Plaintiff's complaints (Waddell Dep. at 27).

After speaking to Waddell about her concerns, and determining that he had failed to respond within a reasonable time, Plaintiff met with Superintendent Mixon (Black Dep. at 87). Plaintiff met with Mixon at his office, with the intent to discuss the affair and how her report of the affair had interfered with her career. (Black Dep. at 88). According to Plaintiff, Mixon reacted hostilely to her report of the affair. (Black Dep. at 88–89). She explained to him that she needed help with respect to a position (director of pupil personnel) at the central office for which she was applying, and they discussed the salary for the position. (Black Dep. at 89). Plaintiff states that the meeting was "embarrassing" because of Mixon's reaction to her complaints. (Black Dep. at 89).

In March of 1994, three years after Plaintiff's initial complaints regarding Tankovich, Mr. Braun, the school district's legal counsel, informed Waddell that Plaintiff had filed a civil rights complaint, but that in his opinion, the conduct alleged did not constitute sexual harassment. (Waddell Dep. at 29, 38). Braun instructed Waddell to advise Plaintiff by letter that in the future, she should follow the chain of command for any complaints. (Waddell Dep. at 29). In a letter dated March 22, 1994, Waddell informed Plaintiff that Mr. Braun did not believe that she had suf-

fered any civil rights violations, that Superintendent Mixon could not "remedy [her] alleged civil rights violations by removing [her] from the field to the central office," that she was entitled to pursue her concerns with CPS' compliance officer, Wade Franklin, or the Ohio Civil Rights Commission, that her transfer to Yorktown was not disciplinary, and that she should follow the chain of command in the future. (Waddell Dep. at 37; Plaintiff's Memorandum Contra, Exhibit B).

On July 12, 1994, Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging that, because of her sex, she was denied an opportunity to discuss or receive responses concerning employment-related matters (Black Dep. at 101). According to Plaintiff, this charge was based on her meeting with Superintendent Mixon, and his hostility toward her concerns. (Black Dep. at 102–04).

In addition to her claim that her transfer to Yorktown was retaliatory, Plaintiff also claims that she was denied promotions to two positions in Columbus Public Schools as a result of her complaints about Tankovich. (Plaintiff's Memorandum Contra at 8, Defendant's Motion for Summary Judgment at 8). Defendant offers evidence that Plaintiff never formally applied for any positions, and that she only re-

sponded to a preference sheet which COSL Blake distributed to his staff. (Defendant's Motion for Summary Judgment at 8). First, Plaintiff asserts that in August, 1994, she was denied a promotion to the position of principal at Indianola Middle School. CPS promoted Sharon Prentice, a white female, to the position. At the time Prentice was promoted, she had served as assistant principal at Indianola for four years. (Defendant's Motion for Summary Judgment at 27, Exhibit D). On August 12, 1994, Plaintiff filed an EEOC charge alleging that she was denied this promotion based upon discrimination and retaliation (Plaintiff's Memorandum Contra, Exhibit F).

Second, Plaintiff asserts that sometime in August, 1994, she requested the assistant principal position at Mifflin High School. On November 6, 1994, Plaintiff became aware that a white female, Karen Zalac, had been promoted to the assistant principal position at Mifflin High School. At the time she was promoted, Zalac had served as the Administrative Assistant at Mifflin High School for four months. (Plaintiff's Memorandum Contra, Exhibit D). On November 25, 1994, Plaintiff filed an EEOC charge alleging that she was denied this promotion based upon discrimination and retaliation.[5]

5. The record is less than clear as to the bases for each of Plaintiff's EEOC charges and her claims of failure to promote. See e.g., Black Dep. at 101–114, 116, 118, 121–131. In her response to Interrogatory No. 4, Plaintiff states that she was denied the promotion to principal at Indianola Middle School on the basis of race and retaliation. However, in her Memorandum Contra at 30–31, she argues that she was also denied this promotion on the basis of age. With respect to the position of assistant principal at Mifflin High School, in Interrogatory No. 4, Plaintiff states that she was denied this promotion on the basis of race and age. However, in her Memorandum Contra at 31, she states that she has not alleged a claim of age discrimination with respect to the position. Plaintiff directs the Court's attention to "EEOC charge No. 220950705, attached as Plaintiff's Exhibit F." The Court notes, however, that the EEOC charge labeled as Exhibit F is charge No.

220942264. The charge to which Plaintiff refers is not included in the record. Although Defendant has addressed Plaintiff's age discrimination claim with respect to both positions, the Court will address only the claim regarding the Indianola Middle School Principal position filled by Sharon Prentice, in light of Plaintiff's representation that she has not alleged a claim of age discrimination with respect to the position of Mifflin High School Assistant Principal filled by Karen Zalac. See Plaintiff's Memorandum Contra at 30–31.

Additionally, in her Amended Complaint, Plaintiff asserts that she was denied the promotion to the position of Mifflin High School Assistant Principal on the bases of sex, age and retaliation. However, in Interrogatory No. 4, Plaintiff also asserts that she was denied the promotion on the basis of race. Plaintiff refers the Court to EEOC charge No. 220942020, but again, this charge is not in-

Plaintiff took extended sick leave from Yorktown in February of 1995. However, the Yorktown position required a full-time person. (Defendant's Motion for Summary Judgment at 7). Thus, in 1995, CPS transferred Plaintiff from Yorktown to Franklin Alternative Middle School. (*Id.*). Franklin was a larger school and already had two full-time administrators, but needed a third part-time administrator, the position filled by Plaintiff. (*Id.*).

On March 27, 1996, Plaintiff filed her complaint (Record 1)in the United States District Court, and subsequently took disability retirement from CPS in May, 1996. The EEOC issued Plaintiff a right to sue letter on July 23, 1996, and Plaintiff filed an amended complaint (Record 8) on October 18, 1996. Defendant filed the motion for summary judgment on March 31, 1998 (Record 31) and Plaintiff responded to the motion on May 15, 1998 (Record 34). Defendant filed a reply on June 1, 1998 (Record 35). Thus, the motion for summary judgment is fully briefed and is ripe for the Court's consideration.

## II.

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides:

> [Summary judgment]...shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Under this standard, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *See Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial ... the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *See Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). *Accord Oakland County v. City of Berkley*, 742 F.2d 289, 297 (6th Cir.1984).

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted). *Accord Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1455–56 (6th

---

cluded in the record. The Court will assume that Plaintiff's charge does include race. Receipt of more than one of the five charges

filed by Plaintiff would have eased the Court's confusion in this matter.

Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *See Adickes,* 398 U.S. at 157–60, 90 S.Ct. 1598. If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

**B. Fischer Affidavit**

Plaintiff has presented the affidavit of Cheryl Fischer as Exhibit C to Plaintiff's Memorandum Contra. Mrs. Fischer was a teacher at Mifflin Alternative Middle School for seven years, and Plaintiff was her supervisor. In its Reply Memoran-

dum, CPS moves to strike Mrs. Fischer's affidavit on several grounds. (Defendant's Reply Memorandum at 4). First, Mrs. Fischer was not identified as a witness during discovery. (*Id.*). Second, Mrs. Fischer's affidavit was never produced during the course of discovery, and is dated only two days before Plaintiff's Memorandum Contra was filed (*Id.* at 4–5). Instead of receiving a copy of the affidavit, CPS received only an unsworn transcript of a telephone conversation between Mrs. Fischer and Plaintiff's counsel (*Id.* at 5). Based on these facts, Defendant did not depose Mrs. Fischer (*Id.*). Third, CPS granted Plaintiff an extension to file the Memorandum Contra based on Plaintiff's counsel's representation that no additional discovery, including affidavits, would be included or obtained (*Id.*). Fourth, CPS argues that Mrs. Fischer's affidavit "rests solely on conclusory statements unsupported by the evidence, constitutes speculation, is replete with irrelevancies, contains inadmissible evidence such as hearsay," and does not comply with Fed.R.Civ.P. 56(e), because it is not based on personal knowledge (*Id.*).

The Court agrees with CPS, and hereby strikes the Fischer Affidavit, attached to Plaintiff's Memorandum Contra as Exhibit C. The affidavit does not comply with Rule 56(e) in that it contains abundant hearsay and inadmissible evidence. Additionally, the Court relies on Fed.R.Civ.P. 37(c)(1) to strike the Fischer Affidavit, because Plaintiff failed to disclose Mrs. Fischer as a witness during discovery. The Court now turns to Plaintiff's claims.

**III. DISCUSSION**

**A. Title VII: Hostile Work Environment**

Plaintiff alleges that an affair between her supervisor, Principal Stephen Tankovich, and a parent volunteer, Cynthia Stanley, created a hostile work environment and unreasonably interfered with her work performance.

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's ... sex." *See* 42 U.S.C. § 2000e–2(a)(1). A plaintiff may establish a violation of Title VII, without having to prove a tangible employment action, by proving that sex-based discrimination created a hostile or abusive working environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir.1999).

■ To establish a hostile work environment claim, a plaintiff must show: (1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment, and (5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462–63 (6th Cir.2000), *Williams*, 187 F.3d at 560–61.[6]

■ For the sexual harassment to be actionable, the workplace must be permeated with discrimination, intimidation, ridicule and insult which is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *See Powell v. Morris*, 37 F.Supp.2d 1011, 1016 (S.D.Ohio 1999) (relying on *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The conduct in question must be judged by both an objective and a subjective standard. The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as such. *See Bowman*, 220 F.3d at 463 (relying on *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367). In making this assessment, courts must consider the "totality of the circumstances." *See Williams*, 187 F.3d at 562 (relying on *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Thus, courts must consider the frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. *See Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Bowman*, 220 F.3d at 463.

■ Additionally, "non-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis, where it can be shown that but for the employee's sex, [she] would not have been the object of the harassment." *See Bow-*

---

**6.** The standard for evaluating an employer's liability for a hostile work environment claim now differs based on the relationship between the perpetrator and the victim. *See Anderson v. Memphis Board of Education*, 75 F.Supp.2d 786, 795 (W.D.Tenn.1999) (citing *Williams*, 187 F.3d at 561). Previously, the plaintiff had to show that a supervisor's harassing actions were foreseeable or fell within his or her scope of employment, and that the employer failed to respond adequately and effectively. *See Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 183–84 (6th Cir.), *cert. denied*, 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992). This heightened standard still applies to plaintiffs trying to establish employer liability for harassment by a co-worker. *See Williams*, 187 F.3d at 561 (citing *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir.1999)). However, with respect to supervisors, the Sixth Circuit held in *Williams*, that, in light of the United States Supreme Court decisions of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), "it is no longer enough for an employer to take corrective action; employers now have an affirmative duty to prevent sexual harassment by supervisors." *See Williams*, 187 F.3d at 561. This fifth element employs a lower standard for establishing employer liability. *See id.* However, this element is considered only after a plaintiff has established actionable discrimination that does not involve a "tangible employment action." *See id.* The employer can then escape liability for harassment by a supervisor only if it took reasonable care to prevent and correct any sexually harassing behavior. *See id.*

*man,* 220 F.3d at 463. Thus, "any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *See id.* (quoting *Williams,* 187 F.3d at 565). In other words, "the law recognizes that nonsexual conduct may be illegally sex-based where it evinces 'anti-female' animus." *See Williams,* 187 F.3d at 565 (citing *Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 905 (1st Cir.1988)). However, because Title VII is not meant to be a "general civility code," it prohibits only discrimination and harassment based on sex. *See Bowman,* 220 F.3d at 463–64. The critical issue in this analysis is whether members of one sex are subjected to disadvantageous terms or conditions of employment to which members of the other sex are not subjected. *See Oncale,* 523 U.S. at 80, 118 S.Ct. 998.

█ In order to survive Defendant's motion for summary judgment, Plaintiff must sustain her burden of proof as to each element of her claim. Plaintiff clearly satisfies the first element as she is a female, and thus a member of a protected class. However, the second element is fatal to Plaintiff's hostile work environment claim. Plaintiff must show that she was subject to unwelcomed sexual harassment. Even considering the facts in the light most favorable to the Plaintiff, as the Court must do when considering a motion for summary judgment, Plaintiff clearly has failed to present evidence sufficient to satisfy this element.

Plaintiff's basic argument regarding how the affair created a hostile environment is as follows: Tankovich was having a sexual affair with a school volunteer during working hours and on school grounds; because of the affair, Tankovich was often unavailable; because of Tankovich's unavailability, Plaintiff was responsible for an undue amount of school discipline, and was required to respond to complaints regarding Tankovich's whereabouts; the complaints and extra responsibility created a hostile environment and interfered with Plaintiff's work performance.

Although Plaintiff now argues that she witnessed a "continuous pattern" of "hand holding, kissing, and touching," between Tankovich and Stanley, she also states that she witnessed no sexual conduct. Even if Plaintiff did witness the conduct alleged, Plaintiff has not shown that she was subjected to any offensive language or touching, and she admits that no harassing behavior was ever directed at her (Black Dep. at 61–62). Plaintiff simply alleges that she witnessed Tankovich and Stanley's conduct, which cannot be classified as "unwelcomed sexual harassment." The conduct at issue, assuming it occurred as described and was witnessed by Plaintiff, was not frequent, severe, physically threatening, or humiliating. Although Tankovich's unavailability may have interfered with Plaintiff's work performance, his conduct with Stanley did not.

The alleged affair between Tankovich and Stanley did not create a hostile work environment. In fact, many courts have held that even a consensual, sexual relationship between a plaintiff's supervisor and a co-worker which results in preferential treatment for the "paramour" does not amount to a hostile work environment. *See e.g., O'Patka v. Menasha Corp.,* 878 F.Supp. 1202, 1207 (E.D.Wis.1995); *Candelore v. Clark County Sanitation Dist.,* 975 F.2d 588, 590 (9th Cir.1992); *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 862 (3rd Cir.1990). *See also Broderick v. Ruder,* 685 F.Supp. 1269, 1277 (D.D.C.1988) ("Title VII is also violated when an employer affords preferential treatment to female employees who submit to sexual advances or other conduct of a sexual nature and such conduct is a matter of common knowledge"). These cases are distinguishable from Plaintiff's claim because her claim involves an affair between her supervisor and an outside person who was not an employee. Surely if an affair between a supervisor and a co-employee

does not create a hostile work environment, then the alleged affair between Tankovich and Stanley, a parent volunteer, also does not.

Even assuming, arguendo, that Plaintiff could establish the first two elements of the prima facie case, she cannot establish the third, that the alleged harassment was based on her sex. Plaintiff makes two arguments regarding this element. First, she argues that Tankovich's conduct was "based upon sex" because "[t]he very nature of an affair involves sexual activity to some extent." (Plaintiff's Memorandum Contra at 22). Second, Plaintiff seems to argue that Tankovich's conduct was "based upon sex," because he felt empowered to engage in the alleged conduct because of Plaintiff's sex, in that because Plaintiff was a woman, Tankovich felt he could get away with his inappropriate conduct.

Even assuming that the conduct at issue could be classified as "harassment," it was not based on Plaintiff's sex. First, Plaintiff seems to equate the abstract term "sex," meaning sexual activity, with the term "sex," referring to gender. The fact that some type of sexual activity may have been occurring does not mean that the Plaintiff was subjected to harassment based on her sex. Likewise, Plaintiff's argument regarding Tankovich's empowerment is unsupported. Under Title VII, "nonsexual" harassment which is "sexbased" may be properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, she would not have been the object of harassment. *See Bowman,* 220 F.3d at 463 (relying on *Williams,* 187 F.3d at 565). In Title VII actions, it is important to distinguish between harassment and discriminatory harassment. As the Sixth Circuit noted in *Bowman,* "while [the plaintiff] may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender." *Bowman,* 220 F.3d at 464. *See also Barnett v. Dept. of Veterans Affairs,* 153

F.3d 338, 342–43 (6th Cir.1998) ("personal conflict does not equate with discriminatory animus"), *cert. denied,* 525 U.S. 1106, 119 S.Ct. 875, 142 L.Ed.2d 775 (1999). Plaintiff offers no evidence to show that Tankovich acted as he did because she is a woman, or that the hostility in her workplace was in any way related to her sex.

Assuming Plaintiff could establish the first three elements of her hostile work environment claim, Plaintiff cannot establish the fourth element, that the harassment created a hostile work environment. The Court must consider whether the workplace was permeated with discriminatory intimidation, ridicule, and insult which were sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. This is judged both objectively and subjectively.

First, Plaintiff must show that the harassment permeated the working environment. Although Tankovich's conduct may have affected Plaintiff's working conditions in that his abdication of his responsibilities shifted work to Plaintiff, his conduct alone cannot be said to have permeated the environment. While the effects of his conduct, as well as the rumors regarding his conduct, clearly affected Plaintiff's working environment, the conduct of which Plaintiff complains did not. Plaintiff alleges that she witnessed several incidents of Stanley and Tankovich "holding hands, jokes, sitting on Mr. Tankovich's lap." (Defendant's Motion for Summary Judgment, Exhibit G, Interrogatory No. 4). Although this conduct, as Defendant concedes, may be "personally offensive and in poor taste," it does not rise to the level of severity or pervasiveness required to establish this claim. Title VII does not prohibit conduct which is merely offensive.

Thus, while unprofessional, personally offensive conduct may have permeated Plaintiff's working environment, thereby creating an unpleasant working environment, Plaintiff has failed to demonstrate

that pervasive sexual harassment existed which created a hostile working environment. Although Plaintiff may have found her workplace to be personally hostile, she clearly has not demonstrated that it was objectively "hostile" in terms of Title VII.

## B. Title VII: Disparate Treatment

In her Amended Complaint, Plaintiff contends that she was transferred and denied promotions on the basis of sex and race (Complaint, ¶¶ 6–18).

In order to succeed in a Title VII action for disparate treatment employment discrimination based on race or sex, a plaintiff must demonstrate that the adverse employment decisions would not have been made "but for" her race or sex. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir.1988). A plaintiff can make this showing by presenting direct evidence, or by inference, from a prima facie showing of discrimination using the evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ In order to establish a prima facie case of disparate treatment, a plaintiff must at a minimum show that she is a member of protected class and she was treated differently than persons who are not members of a protected class. *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 658 (6th Cir.1999). Thus, to prove a prima facie case of disparate treatment under Title VII, a plaintiff must prove that (1) she is a member of protected class; (2) she was qualified for the job; (3) an adverse employment action was taken against her, and (4) she was treated differently than similarly situated non-protected employees. *See O'Hara v. Mt. Vernon Bd. of Educ.*, 16 F.Supp.2d 868, 886 n. 16 (S.D.Ohio 1998). In order to prove the fourth element, a plaintiff must produce evidence that the "relevant other employees are 'similarly situated in all respects.' "

*See Hollins*, 188 F.3d at 659 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)). Once the plaintiff establishes the prima facie case, the employer must meet its burden of production to establish a legitimate, nondiscriminatory reason for the plaintiff's discharge or denial of promotion. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The burden of production then shifts back to the plaintiff to show by a preponderance of the evidence that the employer's legitimate reasons are a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

### 1. Transfer

■ Plaintiff claims that her 1992 transfer from Mifflin Alternative Middle School to Yorktown Middle School constituted disparate treatment under Title VII. Defendant responds that Plaintiff was transferred to a position where she would better be able to handle her disciplinary responsibilities. Plaintiff has offered no direct evidence of discrimination, and therefore must rely on the burden shifting framework.

Plaintiff satisfies the first two elements because as a black female, she is a member of a protected class, and the parties do not dispute whether she was qualified for her position. As for the third element Plaintiff must establish that she was subject to an adverse employment action.

The United States Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits as well as the denial of a raise or promotion" *See Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257. In *Hollins*, 188 F.3d 652, 662, the Sixth Circuit held that in order to satisfy the required "adverse employment action" element, the plaintiff must establish "[a] materially ad-

verse change in the terms and conditions of [his] employment." The *Hollins* court explained that:

> a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of responsibilities. A materially adverse change might be indicated by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*See id.* (quoting *Crady v. Liberty Nat'l Bank & Trust. Co.,* 993 F.2d 132, 136 (7th Cir.1993)).

The Sixth Circuit has held that reassignments without salary or work hour changes do not ordinarily constitute adverse employment actions. *See Kocsis v. Multi–Care Management Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (citing *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir. 1987)). Additionally, barring unusual circumstances, . . . a transfer at no loss of title, pay, or benefits does not amount to . . . [an] adverse employment action. *See Darnell v. Campbell County Fiscal Court,* 731 F.Supp. 1309, 1313 (E.D.Ky.1990), *aff'd,* 924 F.2d 1057 (6th Cir.1991) (table). In *Darnell,* the court rejected the plaintiff's argument that his transfer to a position with the same duties, pay, and grade level constituted an adverse action because it required him to drive an additional 20 minutes to reach his office. In *Strouss v. Michigan Dep't of Corrections,* 75 F.Supp.2d 711, 725 (E.D.Mich.1999), the plaintiff was transferred to another facility and was required to work a different shift. The employer argued that the plaintiff could not establish a legally cognizable adverse employment action because the change was merely a lateral transfer which did not entail any change in the plaintiff's salary or position. *See id.* While acknowledging that the transfer did not cause the plaintiff to suffer any decrease in wages or benefits, the court noted that the

transfer required a change in the plaintiff's work hours, which impaired her ability to continue to take college classes. *See id.* The court found that unlike the plaintiffs in *Kocsis* and *Yates,* the plaintiff's transfer was intended to be permanent, and thus would materially impact her ability to continue her education. *See id.* at 726. Thus, the lateral transfer constituted an adverse employment action. *See id.*

The Court has found several cases dealing with facts similar to those at issue. In *Spring v. Sheboygan Area School District,* 865 F.2d 883, 886 (7th Cir.1989), a case involving the ADEA, the Seventh Circuit determined that the reassignment of a school principal was not a materially adverse change in the terms of conditions of her employment. The plaintiff was transferred to a dual-principalship position that she argued was perceived disfavorably by the public. However, with her new position, plaintiff received a new employment contract and a merit pay increase. The court found that based on the evidence, the new position was advantageous to the plaintiff, and concluded that the public's perception of the transfer was not a term or condition of the plaintiff's employment.

In *Plotner v. Swanton Local Board of Education,* 85 F.Supp.2d 747 (N.D.Ohio 2000), the plaintiff, the school district superintendent's secretary, alleged that she was transferred in retaliation for engaging in protected activity. The plaintiff was interested in a new position which would require her transfer from the central school board office to the high school testing center. Although the issue was not directly before the court, it noted that it had "grave doubts" as to whether the proposed transfer constituted an adverse employment action. *See* id. at 753. The court explained that:

> Determining whether an employee has suffered an adverse action necessarily requires a case-by-case inquiry. On a motion for summary judgment, the [c]ourt must consider the combined effects of the [d]efendants' alleged conduct

in totality. It is not disputed that [the plaintiff] was not discharged, or demoted, and her income was not reduced. It is not disputed that [the plaintiff] did not object to the change in job duties. The change in location was de minimis; the [c]ourt takes judicial notice that ... the buildings in issue are located less than half a mile apart.

Defendant argues that Plaintiff's transfer to Yorktown Middle School cannot be labeled an adverse employment action because Plaintiff was not demoted, put in a worse position, nor given additional responsibilities. In fact, Defendant emphasizes that "Plaintiff's duties were considerably lessened by her transfer to Yorktown." (Motion for Summary Judgment at 26). Defendant cites *Yates*, 819 F.2d at 638, for the proposition that "temporary transfers or demotions that reduce an employee's duties and responsibilities, but maintain the employee's salary and benefits are not considered adverse employment actions." (Motion for Summary Judgment 26).

Defendant's reliance on this argument is misplaced for two reasons. First, the Court finds no evidence in the record that Plaintiff's transfer to Yorktown Middle School was "temporary." Second, although reassignments without salary or work hour changes do not ordinarily constitute adverse employment actions, Plaintiff makes a strong argument that her transfer to Yorktown, while on the surface a lateral transfer, was in fact, a demotion.

Plaintiff argues that she was transferred from Mifflin Alternative School, an elite, alternative school with an international focus, where to get a position one must competitively bid, to a regular middle school. (Plaintiff's Memo Contra at 26; Waddell Dep. at 54). Additionally, the Yorktown position was less suited to Plaintiff's skills and expertise in foreign language education and foreign studies, than Mifflin, where she was able to utilize her talents to implement programs. *Cf. Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641–42 (2nd Cir.2000) (transfer of teacher from junior high special education keyboarding classes to high school mainstream keyboarding classes not an adverse employment action; teacher failed to show that the assignment was less prestigious, less suited to his skills and expertise, or less conducive to career advancement). *See Jones v. Sch. Dist.*, 198 F.3d 403, 412 (3rd Cir.1999) (transfers of science teacher which resulted in loss of opportunity to teach his speciality subject and placement in a "difficult" school constituted adverse employment actions); *Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 362 (8th Cir.1997) (transfer of teacher from class for gifted students to regular classroom constituted an adverse employment action); *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 365–66 (2nd Cir.1980) (transfer of junior high art teacher to elementary school constituted an adverse employment action because teacher's education and expertise focused on developing programs for junior high students). *See also Coleman v. Wayne State Univ.*, 664 F.Supp. 1082, 1092 (E.D.Mich.1987) (transfer of university personnel officer from Personnel Services department, where he was involved in hiring and affirmative action policies, to Staff Benefits department, where he would not be involved in those matters, was an adverse employment action).

Although Plaintiff was not given additional responsibilities, she was put in a worse position given the difference between the two schools and her expertise. Defendant readily admits that as a result of her transfer, Plaintiff's duties were "considerably lessened." As Plaintiff argues, however, Defendant did not help her when it transferred her, because she was not seeking to have her duties and disciplinary responsibilities lessened. Instead, Plaintiff complained about the undue burden which Tankovich's unavailability placed upon her.

In viewing the facts in the light most favorable to Plaintiff, as the Court must do

in considering Defendant's motion for summary judgment, the Court finds that Plaintiff's transfer to Yorktown constitutes a materially adverse employment action which is actionable under Title VII. Plaintiff's transfer was unsolicited and permanent. By the Defendant's own admission, the position to which Plaintiff was transferred entailed significantly diminished material responsibilities. The position was less distinguished. This is not a case, as in *Spring,* where there is only a "perception" of such. Instead, Defendant's own hiring and promotion practices, which differentiate between alternative schools and regular schools, clearly and objectively demonstrate that Plaintiff's position at Yorktown was less distinguished than her position at Mifflin. Additionally, Plaintiff was not be able to utilize her foreign language specialty at Yorktown as she was able to do at Mifflin.

■ Although Plaintiff satisfies the first three elements of the prima facie case, she fails to satisfy the fourth, that she was treated differently than persons who are not members of a protected class. Although Plaintiff never specifically explains, the Court assumes that with respect to her transfer, Plaintiff believes she was treated differently than Tankovich, a white male. Presumably, Plaintiff believes that because Tankovich was the root of the problems at Mifflin, it was he, and not she, who should have been transferred.[7] The problem with this disparate treatment claim is that Plaintiff and Tankovich were not "similarly situated," because each occupied a unique administrative position. Additionally, this case does not involve disparate disciplinary action where each employee engaged in similar conduct for which one received unjustifiably different punishment.

7. *See* Blake Dep. at 71:

> Q: Did you ever consider, Mr. Blake, transferring Mr. Tankovich as Principal of Mifflin Middle School?
> A: No, I did not.

The fourth element of a prima facie case of disparate treatment—proof that Plaintiff was treated differently from similarly situated non-protected employees—is critical, because such proof would support an inference of discrimination. Without that evidence, there is no prima facie case of discrimination, and, in the present case, Plaintiff has failed to meet her burden of producing such evidence. While the proffered reasons for Plaintiff's transfer may be disputed, and while the transfer may not have been in Plaintiff's best interests, or indeed, in the best interests of the school system, there is simply no evidence produced by Plaintiff that would support any finding that the transfer was motivated by sex or race-based animus.

### 2. Promotions

Plaintiff also asserts a disparate treatment claim on the basis of sex and race regarding the denial of two promotions.

In order to establish a prima face case of discrimination based upon the failure to promote, in the absence of direct evidence, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion, and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time Plaintiff's request for promotion was denied. *See Nguyen v. Cleveland,* 229 F.3d 559, 563 (6th Cir.2000) (citing *Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1095 (6th Cir. 1996)); *Brown v. Tennessee,* 693 F.2d 600, 603 (6th Cir.1982).

### A. Mifflin High School Assistant Principal

■ Plaintiff discovered in November, 1994 that the position of Assistant Princi-

> Q: So it's fair to say after your investigation that you found no merit to Mrs. Black's complaints?
> A: It's fair to say that in my talking to Mr. Tankovich about those specific allegations, I did not feel that a move was warranted.

pal at Mifflin High School had been open. Plaintiff argues that CPS denied her request for promotion and promoted a similarly situated white female to the position.

Plaintiff must establish a prima facie case regarding the Mifflin High School position. First, as a black female, Plaintiff is a member of a protected class. Second, Plaintiff must show that she applied for and was qualified for the position at issue. There is some dispute about whether Plaintiff actually applied for this position. Although it is clear that Plaintiff did not apply for the position in the traditional sense of filling out an application or submitting a resume, Plaintiff asserts that she did in fact follow the procedures used in the school district for filling such vacancies.[8] Although it is not entirely clear that Plaintiff satisfies this element, for purposes of summary judgment the Court construes the facts in the light most favorable to the non-moving party, the Plaintiff. Additionally, CPS should not benefit from its utilization of an informal promotion system by raising a plaintiff's failure to apply for a position as a fatal defect in her claim. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir.2000) (holding that "in failure to promote cases a plaintiff does not have to establish that he applied for and was considered for the promotion when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion"). *See also Curran v. Portland Superintending Sch. Comm.*, 435 F.Supp. 1063, 1072 (D.Me. 1977) (Title VII plaintiff's failure to apply could not prevent her challenge to employment practices, where her contention was that those very practices made it impossible for her to apply); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 367, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("The denial of Title VII relief on the ground that the claimant had not formally applied for the job could exclude from the Act's coverage the victims of the most entrenched forms of discrimination. Victims ... could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups"). The Court will assume for purposes of this motion that Plaintiff applied for the position, and because the parties do not dispute Plaintiff's qualifications, will also assume that she was qualified for the position of Mifflin High School Assistant Principal.

As to the third element, Plaintiff must show that she was considered for and denied the position. However, Plaintiff does not know if she was considered for the Mifflin High School position. (Black Dep. at 120). Similar to the second element, this lack of knowledge may be attributable to CPS' informal recommendation system. *See Dews*, 231 F.3d at 1022 (plaintiff need not show that he was considered for the position where employer does not provide a formal mechanism for expressing interest in the promotion). Thus, for purposes of this motion, the Court will assume that Plaintiff was considered for the position.

As to the fourth element, Plaintiff must show that she was rejected in favor of a person with similar qualifications who was not a member of her protected class. The position of Mifflin High School Assistant Principal was filled by Karen Zalac, a white female. The parties do not dispute whether Zalac can be considered a "person with similar qualifications." Thus, Plaintiff has satisfied the fourth element necessary for a prima facie showing.

Assuming that Plaintiff can establish a prima facie case, CPS must come forward with a legitimate, nondiscriminatory reason for its employment decision. CPS has offered the Affidavit of Maurice Blake, the COSL responsible for both Mifflin Alternative Middle School and Mifflin High School. Blake states that in his discretion, Karen Zalac was best suited for the position of Mifflin High School Assistant Prin-

8. *See* Black Dep. at 115–20.

cipal, and thus he recommended her for it. According to Blake, Zalac was chosen because of her "level of experience ... in Columbus Public Schools, as well as her job skills and overall performance." (Blake Aff. ¶ 7). Prior to her promotion, Zalac served as the Administrative Assistant at Mifflin High School for four months, and thus was already familiar with the school's procedures and students. Prior to that, she served as Administrative Assistant at another high school which Blake oversaw. Blake felt that Zalac's skills and experience in high schools made her the best candidate for the position.

Defendant has offered a legitimate, nondiscriminatory reason for its employment decision, and thus has met its burden of production. Plaintiff has offered no evidence to refute Defendant's explanation for its decision regarding the Mifflin High School Assistant Principal position. Although Plaintiff argues that one of the women promoted to one of the positions at issue "was less qualified than Plaintiff," (Plaintiff's Memorandum Contra at 6), she has not specified to which women she refers, nor has she offered any evidence to show that Zalac was not better qualified for the position.

### B. Indianola Middle School Principal

▓ Plaintiff also alleges that she was denied a promotion to the position of Principal at Indianola Middle School based on her race and age.

The Principal position at Indianola Middle School was filled by Sharon Prentice, a white female who had served as Assistant Principal of the school for four years prior to her promotion. Robert Stamps, the COSL for Indianola Middle School recom-

mended Prentice for the position because of her experience, performance, and her "excellent rapport with students and staff." (Stamps Aff. at ¶ 6). Additionally, Stamps recognized the importance of continuity, and chose Prentice, who had been the school's Assistant Principal for four years, to serve as its Principal. (*Id.*).

Plaintiff has offered absolutely no evidence to refute this legitimate, nondiscriminatory reason for CPS' decision to promote Prentice instead of Plaintiff.[9] Plaintiff's subjective belief that she was "clearly more qualified" than Prentice is not sufficient to refute CPS' legitimate, nondiscriminatory reason for promoting Prentice. (Plaintiff's Memorandum Contra at 31).

### C. Title VII: Retaliation

Under Title VII, an employer may not discriminate against an employee because the employee has "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *See* 42 U.S.C § 2000e–3(a). In addition to her Title VII claims of sex and race discrimination, Plaintiff also alleges that CPS unlawfully retaliated against her for her complaints regarding the alleged affair, and for the filing of charges with the EEOC.

To establish a retaliation claim under Title VII, a plaintiff must prove: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was

---

**9.** Q: Now the person who got the job, Sharon Prentice, do you know much about her?
A: Not much, I believe that I know that she had fewer years of experience. She is younger. And she is white.
Q: And those [sic] the reasons why you say you were not given the promotion because of race and retaliation?
A: Right. And age.

Q: But you don't know what her particular qualifications are, do you?
A: I know she did not have the years of experience.
Q: But other than that, you don't know exactly what she did or where she came from?
A: Correct.
(Black Dep. at 131).

subjected to severe or pervasive retaliatory harassment by a supervisor, and (4) a causal connection between the protected activity and the adverse employment action or harassment. *See Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir.2000) (citing *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir.1990) (outlining previous standard for prima face retaliation claim)). Plaintiff's success on her retaliation claim does not depend on the merits of the underlying discrimination claim. *See Powell v. Morris,* 37 F.Supp.2d 1011, 1016 (S.D.Ohio 1999); *Spence v. Local 1250, UAW,* 595 F.Supp. 6, 10 (N.D.Ohio 1984) ("An employee need not establish the validity of his original discrimination claim to prove a charge of employer retaliation flowing from the original claim ... the factual truth of the employee's accusation which inspired the reprisal is immaterial ... [w]hat is relevant is that the employee sincerely believed discriminatory practices exited ... ") (internal citations omitted). Thus, the employee need not establish that the alleged conduct she opposed was in fact discriminatory, so long as she can demonstrate that she had a good faith, reasonable belief that the conduct about which she complained was in violation of Title VII. Plaintiff asserts that her transfer to Yorktown, as well as CPS' failure to promote to her to the Mifflin High School and Indianola Middle School positions, constituted retaliation.

### 1. Transfer

██ Plaintiff must first establish that she was engaged in activity protected by Title VII. Prior to her transfer to Yorktown, Plaintiff's only protected activity with respect to Tankovich's conduct consisted of informal complaints. For purposes of Title VII retaliation claims, these informal complaints constitute protected activity. *See e.g., Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793 (S.D.Ohio 1998) (informal complaint to employer concerning practices which are prohibited by Title VII is sufficient to constitute protect-ed activity (citing *E.E.O.C. v. Romeo Community Schools,* 976 F.2d 985, 989 (6th Cir.1992))), *aff'd,* 194 F.3d 1315 (6th Cir. 1999) (table); *Wilson v. Wayne County,* 856 F.Supp. 1254, 1260–61 (M.D.Tenn. 1994) (forms of protected activity under Title VII include publicly and privately expressing that an employer has illegally discriminated, and reporting illegal discrimination to supervisors) *cert. denied,* 525 U.S. 811, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998); *Coleman v. Wayne State Univ.,* 664 F.Supp. 1082, 1092, n. 5 (E.D.Mich. 1987) (finding that repeated public and private expressions of the belief that employer engaged in race discrimination constituted protected activity, and noting that "protected activity ... includes more than the filing of a formal complaint ... it extends to an employee's expression of a reasonable belief that the employer has engaged in discriminatory employment practices ..."); *Arzate v. City of Topeka,* 884 F.Supp. 1494, 1503 (D.Kan.1995) (an informal complaint to management qualifies as protected activity). *But see Weaver,* 71 F.Supp.2d at 794 (complaints concerning unfair treatment in general which do not specifically address discrimination do not constitute protected activity).

Although some of Plaintiff's complaints may have focused on what she perceived to be unfair treatment, many of her complaints also addressed what she perceived to be sexual harassment. In the context of summary judgment, all facts are viewed in the light most favorable to the non-moving party. Therefore, the Court will assume that Plaintiff's informal complaints qualify as protected activity, as they at least in part addressed what Plaintiff believed to be conduct prohibited by Title VII.

Second, Plaintiff's protected activity was known to Defendant. Many school officials, including those who controlled her transfer to Yorktown Middle School were aware of her complaints. Specifically, Maurice Blake and Gregory Waddell, the

COSLs responsible for Plaintiff's transfer, were well aware of Plaintiff's complaints.

Third, Plaintiff must demonstrate that CPS took a materially adverse employment action against her. As discussed above, Plaintiff satisfies this element because her transfer, although it did not entail a decrease in pay, was in fact a demotion, and not a lateral transfer. Plaintiff's transfer to Yorktown was unsolicited and permanent, and resulted in the Plaintiff being moved from a prestigious alternative school where she could utilize her education specialty, to a regular school where her expertise was virtually worthless.

Finally, to establish a prima facie case of retaliation, Plaintiff must establish a causal connection between her protected activity and the adverse employment action. This can be accomplished in two ways. Plaintiff can offer direct evidence, or retaliation can be imputed if, in addition to other evidence, Plaintiff shows a temporal proximity between the protected activity and the retaliatory act. *See e.g., Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 229 (6th Cir.1987) *Brown v. ASD Computing Center,* 519 F.Supp. 1096, 1116 (S.D.Ohio 1981). However, temporal proximity alone is not sufficient to establish retaliation. *See Griswold v. Fresenius USA, Inc.,* 978 F.Supp. 718, 733 (N.D.Ohio 1997).

Although Plaintiff does not specifically rely on the temporal proximity theory, Defendant does argue against it. Defendant correctly argues that a retaliation claim cannot survive merely on proof of a temporal connection which shows the adverse employment action occurring at some point after protected activity. (Defendant's Motion for Summary Judgment at 26). The general rule is that "mere proximity in time between the protected activity and the discharge is not enough, standing alone, to support a finding that the adverse employment decision was in retaliation for the discrimination claim." *See Griswold,* 978 F.Supp. at 733. *Accord Parnell v. West,* 114 F.3d 1188, 1997 WL 271751 *2–

*3 (6th Cir.1997)("temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence")(citing *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986)); *Scroggins v. Univ. of Minn.,* 221 F.3d 1042, 1045 (8th Cir.2000) ("[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation"). Additionally, the greater the time between the protected activity and the adverse action, the less appropriate an inference of retaliation becomes. *See e.g., Joiner,* 949 F.Supp. 562, 569. Thus, evidence that an adverse action was taken "shortly after the plaintiff's exercise of protected rights is relevant to causation." *See Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000).

In this case, the adverse action taken against Plaintiff, her transfer to Yorktown, occurred approximately one year after her first complaints to COSL Maurice Blake. What is significant, however, is that her complaints were on-going, and thus little, if any, time elapsed between her transfer and her most recent complaints to Blake, the individual who made the decision to transfer her. In addition to the temporal proximity of her transfer, Plaintiff offers as direct evidence the statement of COSL Maurice Blake, who made the decision to transfer Plaintiff and informed her of the transfer. According to Plaintiff, Blake told her, "you've been talking to everybody about what was going on over here ... it's too bad you didn't talk loud enough." (Black Dep. at 58).

Although temporal proximity alone is insufficient to establish causation, the Court finds that the temporal proximity between Plaintiff's transfer and her complaints, and the alleged statement of Blake regarding the reason for Plaintiff's transfer, are sufficient to raise a genuine issue of material fact as to causation. *See Griswold,* 978 F.Supp. at 733 (evidence of temporal proximity combined with other evidence is suf-

ficient to establish causation). Thus, Plaintiff has established a prima facie case of retaliation under Title VII.

▋ Defendant responds that it has offered a legitimate, nondiscriminatory reason for its decision to transfer Plaintiff to Yorktown. Defendant argues that Plaintiff was transferred not in retaliation for her complaints about Tankovich's behavior, but because Blake was trying to place her in a position where she would be better able to handle her disciplinary responsibilities, (Motion for Summary Judgment 28, Blake Dep. 56–57), and because Yorktown needed an assistant principal, preferably a black female, who possessed a "strong curriculum background." (Motion for Summary Judgment at 28, Waddell Dep. at 17).

Plaintiff argues that Defendant's proffered reasons for its employment decisions are mere pretext for retaliatory conduct. Specifically, Plaintiff asserts that her complaints to Blake were based on Tankovich's behavior, not concerns about her ability to handle disciplinary duties *per se*. Rather, her extra disciplinary responsibilities about which she expressed concern were a result of Tankovich's unavailability, not her incapability. (Plaintiff's Memorandum Contra at 27). With respect to Yorktown's purported need for an assistant principal with her qualifications, Blake's deposition testimony reveals that at the time Waddell made this announcement, Blake had already informed him of Plaintiff's complaints, and thus Waddell may have tailored the schools "needs" in order to fit Plaintiff's qualifications. (Blake Dep. at 66–67). Additionally, Plaintiff has offered the statement of Maurice Blake, who made the decision to transfer Plaintiff, that she was being transferred because she was "talking to everybody about what was going on . . . ." (Black Dep. at 58). Although the Court will not second guess employers' personnel decisions, the Court finds that Plaintiff has established a prima facie case of retaliation and presented sufficient evidence of pretext to raise a genuine issue of material fact. Whether or not Plaintiff

was transferred to Yorktown in retaliation for her complaints regarding the alleged affair between Tankovich and Stanley is a material issue for a jury to decide. Thus, Defendant's Motion for Summary Judgment is **DENIED** on this issue.

**2. Failure to Promote**

▋ To establish a prima facie case of retaliation based upon a failure to promote, Plaintiff must establish the prima facie elements set forth above. Thus, Plaintiff must first establish that she was engaged in activity protected by Title VII. Her formal and informal complaints to school officials regarding the alleged affair, as well as the filing of EEOC charges, constitute protected activity. *See Weaver*, 71 F.Supp.2d at 793; *Joiner v. Ohio Dep't of Transp.*, 949 F.Supp. 562, 568 (S.D.Ohio 1996) ("The action of filing a complaint alleging employment discrimination with the proper state and federal agencies is clearly protected activity under Title VII"). Plaintiff had filed one EEOC charge prior to the Indianola Middle School assistant principal position opening, and thus that EEOC charge is relevant in determining whether Plaintiff was denied that position for retaliatory reasons. By the time the Mifflin High School principal position became available, Plaintiff had filed two EEOC charges, and thus both are relevant in determining whether CPS' failure to promote her to that position was retaliatory.

Plaintiff satisfies the second element of the prima facie case, because at the times in question, Plaintiff's involvement in protected activities was well known to various CPS officials. Plaintiff satisfies the third element because for purposes of Title VII, a failure to promote is an adverse employment action. *See Nguyen*, 229 F.3d at 562 (citing *Hale v. Cuyahoga Co. Welfare Dept.*, 891 F.2d 604, 606 (6th Cir.1989)). However, Plaintiff has not provided evidence to establish the fourth element, a causal connection between the protected activity and the adverse employment ac-

tion. There is no evidence, other than the fact that alleged failures to promote occurred after and in somewhat close temporal proximity to Plaintiff's formal and informal complaints, to suggest that CPS' failure to promote Plaintiff was retaliatory. Temporal proximity alone is insufficient to prove causation, and Plaintiff has offered no additional evidence. Therefore, Plaintiff has failed to establish a prima face for retaliatory failure to promote.

Even assuming Plaintiff could establish a prima face case for her failure to promote claims, Defendant has asserted legitimate, nondiscriminatory reasons for selecting the individuals who filled the positions at issue, and Plaintiff has offered no evidence to rebut these proffered reasons. Therefore with respect to Plaintiff's retaliatory failure to promote claim, Defendant's motion for summary judgment is **GRANTED**.

### D. ADEA: Age Discrimination

 Plaintiff also asserts a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.* (ADEA), alleging that CPS discriminated against her on the basis of age with respect to the position at Indianola Middle School.[10]

In order to establish a prima facie claim of failure to promote under the ADEA, a plaintiff must introduce evidence sufficient to support a finding that: (1) the plaintiff

was a member of the protected class (age 40 or older); (2) the plaintiff was qualified for the position; (3) the plaintiff applied for and was denied the promotion, and (4) the person promoted was substantially younger than the plaintiff.[11] *See O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996); *Hines v. Ohio State Univ.,* 3 F.Supp.2d 859, 874 (S.D.Ohio 1998). If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407, (1993). In order to survive a motion for summary judgment, the plaintiff must present evidence that the employer's proffered reason is a pretext for unlawful discrimination. *See Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1023 (6th Cir.1993).

Although Plaintiff has established the first three elements for an ADEA claim, she has failed to establish that she was replaced by someone "substantially younger." In *O'Connor,* the Supreme Court held that a replacement must be "substantially younger" in order to be a reliable indicator of age discrimination. *See* 517 U.S. at 313, 116 S.Ct. at 1310. At the time in question, August 8, 1994, Plaintiff was 52 years of age, and Prentice was nearly 45 years of age.[12] Thus, there was a seven year age difference between them.

**10.** Plaintiff's asserts an ADEA claim only for the assistant principal position at Indianola Middle School. Plaintiff has not alleged a claim of age discrimination with respect to the position at Mifflin High School filled by Karen Zalac. (Plaintiff's Memorandum Contra at 30–31).

**11.** Defendant incorrectly asserts that a plaintiff must establish that her replacement was not a member of the protected class. After *O'Connor,* a plaintiff need only show that her replacement was "substantially younger." *See O'Connor,* 517 U.S. 308, 313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433.

**12.** There appears to some confusion regarding the date on which Plaintiff was denied a promotion. In its Motion for Summary Judg-

ment, Defendant refers to 1991 as "the year the Plaintiff claims she was denied promotion." (Motion for Summary Judgment at 30). In her Memorandum Contra, Plaintiff also refers to 1991 as the relevant time in question. However, all evidence in the record, including the Complaint, the Amended Complaint, the Affidavit of Robert Stamps, and the Affidavit of Maurice Blake, indicates that August, 1994 is the time at which Plaintiff was denied the promotion to Principal of Indianola Middle School. Additionally, Defendant's proffered reasons for assigning Sharon Prentice to the position relate to the fact that in 1994, Prentice had already been the school's assistant principal for four years. Prentice became the Principal in 1990. *See* Plaintiff's Memorandum Contra, Exhibit D.

In an unpublished opinion, *Wellman v. Wheeling and Lake Erie Railway Co.*, 134 F.3d 373, 1998 WL 25005 at *4 (6th Cir. 1998) (per curiam opinion), the Sixth Circuit Court of Appeals held that a five-year difference between employees was insufficient to establish an inference of age discrimination. Additionally, the Seventh Circuit has held that a ten-year age difference is presumptively substantial, while a seven-year age difference is presumptively insignificant. *See Hartley v. Wisconsin Bell Inc.*, 124 F.3d 887, 893 (7th Cir.1997). *Accord Richter v. Hook–SupeRx, Inc.*, 142 F.3d 1024, 1029 (7th Cir.1998).

In light of this case law, the Court finds that the seven year age difference between Plaintiff and Prentice is insufficient to raise an inference of age discrimination.

■ Even assuming *arguendo*, that Plaintiff were able to establish a prima facie case of age discrimination, Defendant has come forward with a legitimate, non-discriminatory reason for appointing Prentice the Principal of Indianola Middle School. Prentice had served as Assistant Principal of the school for four years prior to her promotion, and in the opinion of COSL Stamps, Prentice was best-suited to become the school's principal (Stamps Aff. at ¶ 6). Plaintiff has failed to come forward with any evidence to cast doubt on the legitimacy of this response. Thus, summary judgment is **GRANTED** to Defendant on Plaintiff's ADEA claim.

**E. § 1983**

■ Under 42 U.S.C. § 1983, a plaintiff may bring a claim against any person who, "under color of state law causes the deprivation of any rights, privileges, or immunities secured by the Constitution." Thus, in order to bring a § 1983 action, a plaintiff must establish that the actions of persons acting under the color of state law deprived her of a federally protected right.

Thus, for purposes of this claim, the Court will use August, 1994 as the relevant date for Plaintiff's claim. The Court notes that the confusion perhaps stems from Plaintiff's De-

*See E.J. v. Hamilton County*, 707 F.Supp. 314, 316 (S.D.Ohio 1989). A plaintiff must show that she was either intentionally or recklessly deprived of the federal right at issue. *See Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Governmental liability under § 1983 cannot be based on theory of respondeat superior. *See Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1013 (6th Cir.1987) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978)). Thus, CPS cannot be found liable unless Plaintiff demonstrates than "an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *See Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir.1996). *See also E.J. v. Hamilton County*, 707 F.Supp. at 317 ("a § 1983 plaintiff must show that the governmental entities deprived them of a constitutional right either as a result of a 'policy statement, ordinance, regulation, or decision adopted and promulgated by the entity governing body' or as a result of a 'governmental custom even though such a custom may not have received formal approval through the entity's official decisionmaking channels' ") (citations omitted).

Plaintiff does not assert that CPS acted pursuant to an officially enacted policy; instead, she argues that CPS is liable under § 1983 because of its deliberate, intentional indifference to her claims of sexual harassment. She argues that the "silence, lack of direction, and lack of written policy" of Superintendent Mixon, "whose edicts or acts may fairly be said to represent official policy," demonstrate a deliberate, intentional indifference to her sexual harassment claims. *See Monell*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 ("We conclude, therefore, that

position in which she states that in 1991 she filled out a request form indicating her interest in any middle school principal position. *See* Black Dep. at 113.

a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983"). However, liability under § 1983 cannot be premised on negligence, and thus inaction by a defendant will support liability only if there is a "policy" or custom of deliberate indifference in the face of repeated constitutional violations. *See Doe*, 103 F.3d at 508–09.

Plaintiff alleges that CPS has deprived her of the rights to (1) a hostile free work environment; (2) equal protection; (3) freedom of speech, and (4) due process of law. The Court will examine each claim in turn.

### 1. Hostile Work Environment

■ In its Reply Memorandum, CPS argues that "there is no constitutionally recognized right to a hostile free work environment as evidence by Plaintiff's failure to cite any applicable law or constitutional provision." (Defendant's Reply Memorandum at 11). Defendant is incorrect. A plaintiff may bring a hostile work environment claim under both Title VII and § 1983 because "where an employee establishes employer conduct which violates both Title VII and rights derived from another source—the Constitution or a federal statute—which existed at the time of the enactment of Title VII, the claim based on the other source is independent of the Title VII claim, and the plaintiff may seek the remedies provided by § 1983 in addition to those created by Title VII." *See Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1205 (6th Cir. 1984).

■ Plaintiff's § 1983 hostile work environment claim is based on a violation of the Equal Protection Clause, a Constitutional provision which was in existence at the time of the enactment of Title VII, and

thus may serve as an independent source for Plaintiff's § 1983 claim. *See e.g., Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988) (sexual harassment by government employers violates rights protected by the Equal Protection Clause); *Wood v. Topeka*, 90 F.Supp.2d 1173, 1187 (D.Kan.2000) ("sexual harassment can violate the Equal Protection Clause of the Fourteenth Amendment and trigger a § 1983 cause of action, despite the existence of a Title VII cause of action"); *Hollis v. Buffalo*, 28 F.Supp.2d 812, 825 (discussing elements of equal protection claim under § 1983 based on hostile environment sexual harassment). However, the prima facie elements for a § 1983 hostile work environment are the same as those for a Title VII hostile work environment claim. *See e.g., Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483 (6th Cir.1989). Thus, because the Court has determined that Plaintiff is unable to establish a prima facie claim for hostile work environment under Title VII, her parallel § 1983 claim must also fail.

### 2. Equal Protection

To bring a successful § 1983 claim under the Fourteenth Amendment's Equal Protection Clause, Plaintiff must prove the same elements as are required to establish a disparate treatment claim under Title VII. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir.1988).

As previously discussed, Plaintiff cannot establish a prima facie case of disparate treatment under Title VII with respect to her transfer, because she has presented no direct evidence of discriminatory purpose, nor has she established a prima facie case under *McDonnell Douglas*. Although Plaintiff has established a prima facie case of disparate treatment with respect to the subsequent failures to promote, CPS has offered legitimate nondiscriminatory reasons for its decisions, which Plaintiff has failed to refute. Therefore, because Plaintiff cannot maintain her Title VII disparate treatment claims, she likewise cannot

maintain a claim for the denial of equal protection under § 1983.

### 3. First Amendment: Freedom of Speech

Plaintiff also brings a § 1983 claim asserting that CPS violated her First Amendment right to freedom of speech by transferring her and denying her promotions in retaliation for her complaints regarding Tankovich's behavior. (Black Dep. at 58).

"The U.S. Supreme Court has held that a government employee retains her First Amendment right to comment on matters of public concern without fear of reprisal from the government as employer." See Dambrot v. Central Mich. Univ., 55 F.3d 1177, 1185 (6th Cir.1995) (citing Connick v. Myers, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In order to establish a violation of her First Amendment rights, Plaintiff must demonstrate that: (1) she was subject to a legally actionable personnel decision; (2) her speech was constitutionally protected because it addressed a matter of public concern; (3) her interest in speaking outweighed the defendant's interest in regulating her speech, and (4) her speech was a substantial or motivating factor in the personnel decision. See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 583 (6th Cir.) cert. denied, 69 U.S.L.W. 3282 (2000); Coffey v. Chattanooga–Hamilton County Hosp. Auth., 194 F.3d 1311, 1999 WL 824870 at *3 (6th Cir.1999). If the plaintiff meets these burdens, then the defendant can defeat her claim by demonstrating that it would have taken the same action absent the protected activity. See Orick, 945 F.Supp. 1084, 1088 (S.D.Ohio 1996). The employer's motivation for taking the adverse action against the employee is a question of fact for the jury to decide. See Johnson, 215 F.3d at 584.

Plaintiff must first prove that she was subject to a legally actionable personnel decision. "Legally adverse personnel decisions include dismissals, promotions, transfers, and other deprivations less harsh than dismissal." See Coffey, 1999 WL 824870 at *3 (citing Rutan v. Republican Party of Illinois, 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). See also Leary v. Daeschner, 228 F.3d 729, 738 (6th Cir.2000) (involuntary transfer of teacher qualifies as an adverse employment action under First Amendment retaliation analysis).[13]

In this case, Plaintiff alleges that she was transferred and denied promotions in retaliation for exercising her First Amendment rights. In the context of a First Amendment retaliation claim, it is clear that both Plaintiff's 1992 transfer to Yorktown, as well as the denials of promotion which she alleges may be classified as legally actionable personnel decisions.

The second element Plaintiff must establish is that her speech was about a matter of public concern. Speech regarding matters of public concern is that which relates to "any matter of political, social, or other concern to the community." See Dambrot, 55 F.3d at 1186. As the Dam-

---

13. A plaintiff alleging First Amendment retaliation must show that she was subject to a "legally actionable personnel decision." This differs from the "adverse employment action" which a plaintiff must show in an employment discrimination case. The difference arises from the nature of a First Amendment claim, which is intended to prevent the chilling of protected expression. One court has offered the following example:

> [A] transfer that might not qualify as an adverse employment action under Title VII because the employee would receive the same pay, perform the same duties, and so forth, might be an employment decision which is impermissible if substantially motivated by the plaintiff's First Amendment protected activity, as a reasonable person in the circumstances could comprehend the transfer as a punishment for protected speech or an attempt to "chill" that speech by moving the individual from a position in which that speech would be pertinent.

See Bevill v. UAB Walker College, 62 F.Supp.2d 1259, 1295–96 (N.D. Ala.1999).

*brot* court explained, "[t]he linchpin of the inquiry is ... the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *See Dambrot,* 55 F.3d at 1189. The question of whether speech addresses a matter of public concern is a question of law, and is " 'determined by the content, form, and context of a given statement, as revealed by the whole record.' " *See Chappel,* 131 F.3d 564, 574 (6th Cir.1997) (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690); *Dambrot,* 55 F.3d at 1186. The Court must consider the motive which underlies the employee's statements, to determine whether the speech transcends the employee's personal interest. *See Dambrot,* 55 F.3d at 1189. Thus, the Court must ask, "Was it the employee's point to bring wrongdoing to light?" *See Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987). Thus, "the public concern element is lacking as a matter of law if the speech concerns a subject of public interest but the expression addresses only the personal effect upon the employee." *See Howard v. Bd. of Educ.,* 893 F.Supp. 808, 817 (N.D.Ill. 1995). If the speech at issue is determined not to be regarding a matter of public concern, the analysis ends, and no inquiry is made into the motivation for the employer's decision. *See id.* at 1186.

Plaintiff asserts that her speech was constitutionally protected because it addressed a matter of public concern. In her Memorandum Contra, Plaintiff states:

[h]er complaints concerning Mr. Tankovich's sexual conduct on school property, during school hours, falls within 'a matter of public concern.' The very nature of the environment, a middle school, with children as young as ten years of age dictates that any inappropriate behavior would be a matter of public concern. Moreover, her constitutionally and statutorily protected rights were being violated by the environment that Mr. Tankovich created. Thus, the very nature of her complaint addressed a matter of public concern, i.e. the right to work in a hostile free environment

(Plaintiff's Memorandum Contra at 38). Plaintiff also asserts that "the courts and Congress have recognized that sexual harassment in the work place, whether quid pro quo or hostile work environment is a legitimate, political, social, and public concern, otherwise Title VII and cases interpreting it would not exist" (Plaintiff's Memorandum Contra at 39).

In response, CPS contends that Plaintiff's speech was about her personal interest in private matters, and conveyed no other information other than the fact that "a single employee was unhappy with the status quo." (Motion for Summary Judgment at 42). Defendant argues that her speech was about the alleged affair between Tankovich and Stanley, her personal issues with respect to that affair, and the disciplinary problems "presumably caused by the relationship." (*Id.*).

Plaintiff seems to make two basic arguments in support of her speech being classified as relating to a matter of public concern. First, she argues that her speech involved sexual harassment, which is *per se* a matter of public concern. Second, she argues that her speech should receive heightened protection because of its relation to the administration a public elementary school. An examination of federal case law is necessary in order to determine the nature of Plaintiff's speech.

First, although as Plaintiff argues, speech regarding issues such as sexual harassment in public employment situations is often characterized as relating to a matter of public concern, this is not a *per se* rule, because the motivation of the employee must also be considered. For example, in *Callaway,* 832 F.2d at 415, a public school district affirmative action officer alleged sexual harassment by her supervisor. The *Callaway* court stated: "While it is undoubtedly true that incidences of sexual harassment in a public school district are inherently matters of public concern, the *Connick* test requires

us to look at the point of the speech in question: was it the employer's point to bring wrongdoing to light?" *See id.* at 417. The *Callaway* court found that the employee spoke not as a "whistleblower," but as an employee attempting to resolve her private dilemma. *See id.*

In *Howard*, 893 F.Supp. at 812, the plaintiff, a band director at a public school, complained about sexually offensive comments made by teachers and students, and was allegedly subject to retaliation for her speech. The court found that the plaintiff's speech was not motivated by a desire to remedy the sexually offensive conduct for the benefit of others or the public at large. *See id.* at 817. The court stated: "it was plaintiff personally who was offended ... she was not speaking for other teachers at the school when she voiced her complaints." *See id. See also Woodward v. City of Worland*, 977 F.2d 1392, 1403–04 (10th Cir.1992), *cert. denied*, 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993) (speech was personal even though plaintiff complained that other women had been subjected to sexual harassment by employer); *Yatvin v. Madison Metro. School Dist.*, 840 F.2d 412, 419 (7th Cir.1988)("All Yatvin sought by filing charges was to get an appointment as Assistant Superintendent of Instruction in the Madison, Wisconsin school district. She wanted to advance her career, not promote a cause. Sex discrimination is a matter of public concern ... [b]ut so far as we can tell from the record, Yatvin doesn't want to debate sex discrimination").

Other courts have found that public employees' speech about sexual harassment does constitute a matter of public concern. In *Matthews v. High Island Ind. Sch. Dist.*, 991 F.Supp. 840, 843 (S.D.Tex.1998), two public elementary school teachers filed grievances against the principal of their school for sexually offensive conduct. The plaintiffs alleged that their teaching contracts were not renewed in retaliation for their complaints. The *Matthews* court found that plaintiffs' speech did involve a matter of public concern:

> The Court finds it axiomatic that reporting misconduct of a principal, especially misconduct regarding not only sexual harassment, but sexual misconduct in the presence of children, in a grievance to the school board constitutes a 'matter of public concern' worthy of First Amendment protection.

*See id.* at 846. *Accord Wren v. Spurlock*, 798 F.2d 1313, 1316–18 (10th Cir.1986) (holding that teacher's accusations of sexual harassment and poor job performance by a principal involved matters of public concern). *See also Johnson*, 215 F.3d at 585 (university vice-president's speech regarding university's noncompliance with affirmative action program is matter of public concern); *Benningfield v. City of Houston*, 157 F.3d 369, 375 (5th Cir.1998) (finding speech alleging hostile work environment and tampering with criminal histories a matter of public concern) *cert. denied*, 526 U.S. 1065, 119 S.Ct. 1457, 143 L.Ed.2d 543 (1999); *Wilson v. UT Health Center*, 973 F.2d 1263, 1266 (5th Cir.1992) (finding speech alleging sexual harassment a matter of public concern) *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). *See also Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 225–26 (5th Cir.) ("[W]e consistently have refused to extend First Amendment protection to a public employee speaking in his role as an employee unless the speech involves the report of corruption or serious wrongdoing ... this may include claims of sexual harassment ... but should be more than simply criticisms of a supervisor's job performance or management skills") (quotations omitted) *cert. denied*, 528 U.S. 1022, 120 S.Ct. 533, 145 L.Ed.2d 413 (1999).

As for Plaintiff's second argument, that her speech was related to the well-being of the school, *Matthews* lends strong support to this argument, because of the sexual harassment aspect of Plaintiff's speech. *See Matthews, supra*, 991 F.Supp. at 846. However, the general rule is that internal

matters, even those involving public schools, do not constitute matters of public concern. For example, in *Cliff v. Board of School Commissioners of Indianapolis*, 42 F.3d 403, 409 (7th Cir.1994), a public school teacher brought a First Amendment retaliation claim against the school district alleging that her teaching contract was not renewed in retaliation for complaints about her class size and the "general disorder" at the school. The Court found that the plaintiff's speech did not constitute a matter of public concern, because her expression addressed only the personal impact of those issues on her, and she was not speaking for other teachers at the school. *See id.* at 411. The court based its opinion on the fact that the plaintiff did not attempt to call public attention to the matter, and limited her complaints to private conversations and to the union grievance procedure. *See id.* The court stated: "plaintiff complained only to bolster her own position in a private personnel dispute with her superiors." *See id. Accord Saye v. St. Vrain Valley Sch. Dist.*, 785 F.2d 862 (10th Cir.1986)(complaint concerning allocation of aide time among teachers was not a matter of public concern).

However, in some cases, a teacher's speech regarding school issues has been held to involve matters of public concern. For example, in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the United States Supreme Court held that a teacher's comments about whether his school system required additional funds touched upon a matter of public concern, and thus received First Amendment protection. Likewise, in *Bernheim v. Litt*, 79 F.3d 318, 325 (2nd Cir.1996), the Second Circuit found a teacher's statements regarding the quality of education in the school district to be a matter of public concern.

The Sixth Circuit has recently decided a case whose facts are somewhat similar to those of the case *sub judice*. In *Leary*, 228 F.3d 729, 735, two elementary school teachers brought a civil rights action against the superintendent of the board of education alleging that they were transferred in retaliation for their speech. The plaintiffs alleged that their transfers were in retaliation for their highly vocal criticism of the school's management, including student discipline and a proposed improvement plan for the school. *See id.* The school district argued that the plaintiffs were transferred because they were not "team players" and disagreed with the improvement plan which was to be implemented. The Sixth Circuit found that the subjects of plaintiffs' speech, student discipline and the appropriate educational program to be implemented, were "undoubtedly matters of concern to the community at large." *See id.* at 737.

The Court now turns to the facts of the case *sub judice* in order to determine whether the Plaintiff's speech was regarding a matter of public concern.

Plaintiff's complaints regarding the alleged affair between Stanley and Tankovich and her disciplinary responsibilities first began in the Spring of 1991 and were made to Blake, Plaintiff's COSL. (Black Dep. at 26). She continued to meet with Blake on a regular basis, perhaps as often as two to three times each week. (Black Dep. at 37). Plaintiff's complaints, although numerous, were informal. The majority of her complaints took the form of oral communication with Blake. Not until she wrote a letter to Joyce Beltz in 1992, did Plaintiff formalize her complaints (Plaintiff's Memorandum Contra, Exhibit A; Black Dep. at 75).

The overwhelming impression from the record is that Plaintiff's complaints regarding the alleged affair and its effects were motivated by Plaintiff's personal concerns, and not by a need to speak out on behalf of others. It is true that Plaintiff was the Assistant Principal and may have felt an obligation, because of her position, to bring the issue to the attention of the district administration. (Black Dep. at 31–32). It is also true that scattered throughout the record there are references to Plaintiff's

concerns about the effect the alleged affair was having on the students and the learning environment at Mifflin. For example, in her deposition, Plaintiff states: "I knew that it was very destructive for the school, for the staff, children. The children had commented about it," (Black Dep. at 56), and "[t]here was some harassment of the students in terms of where Mr. Tankovich was or whether or not he was available and how quickly they could get him . . . [t]his was particularly bothering the secretary because, they, in particular Ms. Chapman, monitored the student helpers . . . [a]nd it was repulsive and repugnant." (Black Dep. at 50). Additionally, there is some evidence that Plaintiff may have been concerned for the affair's effect on the staff. For example, Plaintiff testified that Tankovich's behavior was "poisoning the workplace" (Black Dep. at 61), and that the staff brought concerns to her about Tankovich's conduct (Black Dep. at 32). In fact, Plaintiff testified that staff members were "very concerned about the affair in the building and the impression that it was giving students, parents, community, et cetera. And as a sounding board or a reporting board, because there were only two administrators in the middle school, they brought those observations and concerns to me." (Black Dep. at 32).

In her Memorandum Contra, (Record 34 at 38) Plaintiff makes the following argument regarding the nature of her speech:

Her complaints concerning Mr. Tankovich's sexual conduct on school property, during school hours, falls within "a matter of public concern." The very nature of the environment, a middle school, with children as young as ten years of age dictates that any inappropriate behavior would be a matter of public concern. Moreover, her constitutionally and statutorily protected rights were being violated by the environment that Mr. Tankovich created. Thus, the very nature of her complaint addressed a matter of public concern, i.e. the right to work in a hostile free environment.

Plaintiff fails to appreciate two important points. First, Plaintiff's motivation in speaking about the alleged affair is a critical element in the Court's analysis of the nature of her speech. Second, although the majority of case law discussed *supra* held speech alleging sexual harassment to be a matter of public concern, the conduct about which Plaintiff complained was not sexual harassment, but highly inappropriate, unprofessional conduct. Although Plaintiff's argument regarding the seriousness of such "inappropriate behavior" occurring at a middle school is attractive, it fails to consider the plaintiff's motivation in speaking about that behavior.

The Court finds that Plaintiff's speech was not regarding a matter of public concern. First, the actual complaints had little factually to do with Tankovich's alleged behavior, and instead were focused on how his behavior affected Plaintiff's job duties, including her disciplinary responsibilities. Second, as evidenced by Plaintiff's complaints, Plaintiff's motivation was clearly personal, and not based on a desire to alleviate a matter of public concern.

The record is replete with testimony that Plaintiff's motivation for complaining about Tankovich's behavior was personal, and focused primarily on ensuring her own career advancement. For example, Plaintiff testified regarding the alleged affair that "something should have been done so that it did not interfere with my career. So that did not interfere with what is called my career path." (Black Dep. at 56).[14]

---

14. Plaintiff refers to her "career path" several times. *See e.g.*, Black Dep. at 59–60:

Q: So you never told Mr. Blake at any time that you wanted to transfer?
A: No, not to transfer, a promotion. I knew that transferring would break my line.

Q: What do you mean by that?
A: Well, it's widely considered that you have hierarchy of ascent, which is through your principal that you've worked with for a long time. They are supposed to stand behind you and say good things about you,

At one point, Plaintiff met with Lou Mazzoli, a CPS employee who worked at the Central Education Center, and showed him a letter which she had written to Joyce Beltz regarding the alleged affair. According to Plaintiff, Mazzoli asked her if she wanted him to assist her in resolving her concerns, but she declined his help, stating that she was thinking "more personally." (Black Dep. at 77).

Regarding her meeting with Superintendent Mixon, Plaintiff stated:

> I was concerned that there was an affair going on at Mifflin Alternative Middle School and *my intent was to show how it had interfered with my career* ... I said I was applying for a job. And we began to talk about the pay salary for the particular job that was open. I thought it was underneath my current pay salary and I wanted to know what the system did under those conditions. He said that we look out for people and more or less intimated that I would at least be at the same pay salary or above.

(Black Dep. at 88–89) (emphasis added).

In discussing one of her EEOC charges, Plaintiff states the alleged affair had interfered with her "career path," and her "ability to obtain a promotion." (Black Dep. at 101–02).

Perhaps the clearest indication that Plaintiff's speech was motivated by personal concerns is the letter she wrote to Joyce Beltz in June, 1992 (Plaintiff's Memorandum Contra, Exhibit A). She begins and ends the four page letter with a discussion of her qualifications and career aspirations:

> While I have spoken to you about the position of administrator on an administrative team, we have not talked about my specific attributes and what I contributed to Mifflin Alternative M.S. I would like to open that venue by sharing specific details and observation in this position paper. I know there are many excellent professionals in the Columbus

so on and so forth so you can get to the next

Public School System but the Assistant Principal Assignment at Mifflin M.S. included tasks of a magnitude significantly greater than any other assignment would have been ...

I would not be transferred from Mifflin Alternative Middle School except for the following extenuating circumstances. The responsibility of this abusive misconduct came to me as the member of the administrative team people could talk to. I have worked dilligently [sic] over the last 5 years and I have done an admirable job with what I have had to deal with ...

Frankly I felt like a slave oaring a vessel accross [sic] the seas without visability [sic] or recognition. Compelled to keep the school at a flagship level in spite of what was going on around and above me.

In conclusion, my tenure at Mifflin Alt. M.S. should culminate with a position that recognizes what has been accomplished. This lateral transfer is not an acceptable action after 26 years of excellence with the Columbus Public Schools. I appeal to be reconsidered for a position commensurate with my abilities as an experienced administrator who took the responsibility for the development of a new, exciting, and successful concept for the Columbus Public Schools.

In finding that Plaintiff's speech does not to relate to a matter of public concern, the Court does not condone the alleged conduct of Tankovich, nor does it find fault with Plaintiff's complaints regarding that conduct. The Court simply finds that Plaintiff's complaints do not receive First Amendment protection because they dealt primarily with matters unrelated to a matter of public concern, namely Plaintiff's disciplinary responsibilities, and were motivated by Plaintiff's personal beliefs and career aspirations. Thus, because Plaintiff's complaints are not protected by the First Amendment in the employment con-

level.

text, the Court need not consider the issues of causation or the motivation of CPS in taking adverse action against Plaintiff. *See Orick v. Banziger,* 178 F.3d 1295, 1999 WL 164908, *1 (6th Cir.1999) (citing *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684 (1983)).

### 4. Due Process

In her Amended Complaint, Plaintiff does not specify in what way CPS violated her right to due process. In her Memorandum Contra, Plaintiff attempts to identify the rights of which she claims she was deprived. First, Plaintiff argues that CPS violated her due process rights by "denying her the right to a fair process in which to voice her statutorily protected rights under Title VII" and by "indiscriminately transferring her without any official explanation to a less desirable administrative position and by denying her promotions in which she was clearly more qualified for without any legitimate expectations." (Plaintiff's Memorandum Contra at 36). Second, Plaintiff argues that CPS violated her due process rights when she was denied her "significant property interest" in her means of livelihood, her right created under Title VII to a hostile free working environment, and her "opportunity to advance in the system." (*Id.*).

The Fourteenth Amendment Due Process Clause prohibits a state from depriving any citizen of "life, liberty, or property without due process of law." To state a claim for a violation of procedural due process, a plaintiff must (1) assert a protected property or liberty interest, and (2) show that state action deprived her of that interest without due process of law. *See Hajjar v. Dayner,* 96 F.Supp.2d 142, 144 (D.Conn.2000).

Thus, Plaintiff must first establish that she has a sufficient property interest under state law relating to her employment before she can invoke the protections of procedural due process. *See Bremiller v. Cleveland Psychiatric Institute,* 879 F.Supp. 782, 791 (N.D.Ohio 1995). The claimed property right may be established by evidence of a statute, policy, practice, regulation, guideline, written contract, or contract implied from a mutually explicit understanding of the parties. *See id.*

In the vast majority of employment cases involving § 1983, the plaintiff asserts a property interest in employment *per se,* or "continued employment." *See e.g., Thomas v. Farmer,* 573 F.Supp. 128, 131 (S.D.Ohio 1983). In this case, however, plaintiff's employment was not terminated. Thus, even if Plaintiff could demonstrate a property interest in continued employment, she cannot prove that she has been deprived of that property interest because she has not been suspended or terminated from her employment with CPS. *See id.* Thus, Plaintiff's asserted property interests must pertain to the transfer and promotions.

As CPS correctly notes, "Plaintiff has presented no evidence, whatsoever, to demonstrate that she had an entitlement or a property right in either avoiding transfer to another school or in being promoted to a different position." (Motion for Summary Judgment at 38). Federal case law indicates that Plaintiff could not establish a valid § 1983 claim for deprivation of her right to procedural due process, because her claim relates only to involuntary transfer and failure to promote, as opposed to continued employment. *See e.g., Murray v. Bd. of Educ. of City of New York,* 984 F.Supp. 169, 183 (S.D.N.Y.1997) (plaintiff had no property right, and thus no right to procedural due process, with respect to her involuntary transfer or failure to be hired as assistant principal); *Anglemyer v. Hamilton County. Hosp.,* 58 F.3d 533, 539 (10th Cir.1995) ("[T]he overwhelming weight of authority holds that no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory or contract provision to the contrary"). *See also Hajjar v. Dayner,* 96 F.Supp.2d 142, 144 (D.Conn.2000) (failure to transfer

plaintiff did not implicate protected property interest). Thus, because Plaintiff has failed to present any evidence indicating that she has a property right relating to transfers or promotions, her claim must fail.

■ It is not clear from the record whether Plaintiff asserts a substantive due process claim in addition to her procedural due process claim. To the extent that she does, the Court finds that CPS is entitled to summary judgment. The substantive due process component of the Fourteenth Amendment protects "specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action. The fundamental rights protected by substantive due process arise from the Constitution itself and have been defined as those rights which are 'implicit in the concept of ordered liberty.'" See Gutzwiller v. Fenik, 860 F.2d 1317, 1328, (6th Cir.1988). The Sixth Circuit's caselaw is clear that public employees enjoy no substantive due process right in public employment. See Bremiller, 879 F.Supp. 782, 791 (N.D.Ohio 1995)(citing Sutton v. Cleveland Bd. of Educ., 958 F.2d 1339, 1351 (6th Cir.1992)). Thus, Plaintiff's lesser, subsumed interests regarding transfers and promotions in public employment clearly are not protected by substantive due process. See e.g., Thomson v. Scheid, 977 F.2d 1017, 1020 (6th Cir.1992) ("the right to a promotion is not a fundamental interest protected by substantive due process"); Charles v. Baesler, 910 F.2d 1349, 1353 (6th Cir.1990) (state-created contractual right to promotion is not afforded substantive due process protection).

As Plaintiff has failed to assert any protected property interest, and thus has also failed to demonstrate any deprivation of such a interest, she has not established a claim under § 1983 for violation of due process. The Court **GRANTS** CPS' motion for summary judgment on Plaintiff's § 1983 due process claim.

### F. Ohio Revised Code Chapter 4112

■ Plaintiff also brings claims under the Ohio Civil Rights Act, Ohio Revised Code Chapter 4112, which prohibits employers from discriminating against employees on the basis of race, color, religion, sex, national origin, disability, age, or ancestry, and from retaliating against employees for exercising their rights. See Ohio Rev.Code § 4112.02, § 4112.14. Plaintiff asserts claims under Chapter 4112 on the basis of sex, race, age and retaliation. The parties agree that under Ohio law, federal case law interpreting Title VII and the ADEA is generally applicable to claims brought under Chapter 4112.[15]

Thus, because the Court has granted summary judgment to Defendant on Plaintiff's Title VII hostile work environment, Title VII disparate treatment, Title VII retaliation, and ADEA discrimination claims, the Court hereby GRANTS summary judgment to Defendant on Plaintiff's claims asserted under Ohio Revised Code Chapter 4112.

### G. Ohio Revised Code § 4113.52

■ Plaintiff also asserts a claim for retaliation against CPS under Ohio Revised Code § 4113.52, commonly referred to as Ohio's "Whistleblower Act." As its

**15.** One notable exception to this general rule is that under Ohio Rev.Code § 4112.02, to establish a prima facie case of age discrimination, the plaintiff must show that she was replaced by someone who is outside of the protected class, i.e., younger than forty years of age. See Byrnes v. LCI Communication Holdings Co. (1996), 77 Ohio St.3d 125, 672 N.E.2d 145, cert. denied, 521 U.S. 1104, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997). This differs from a prima facie case under the ADEA, where a plaintiff must demonstrate that she was replaced by someone "substantially younger." However even under Ohio Rev.Code § 4112.02 Plaintiff fails to establish a prima facie case, because the individual who received the promotion, Sharon Prentice, was also within the protected class. Thus, absent direct evidence of age discrimination, Plaintiff cannot maintain an age discrimination claim under § 4112.02.

popular name indicates, the Act protects from retaliation, "whistleblowers," those employees who report violations of federal, state or local statutes, ordinances or regulations which they reasonably believe constitute a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, or is a felony. *See e.g., Brooks v. Martin Marietta Util. Servs., Inc.*, 166 F.3d 1213, 1998 WL 739890 at *4–5 (6th Cir.1998), *cert denied*, 526 U.S. 1122, 119 S.Ct. 1777, 143 L.Ed.2d 805 (1999).

Defendant argues that it is entitled to summary judgment on this claim because Plaintiff "has failed to provide any evidence that any alleged violation constituted a *criminal offense, a hazard to public health or safety or a felony*." (Motion for Summary Judgment at 32) (emphasis added). Although the Court ultimately agrees with Defendant, it does so for somewhat different reasons related to the interpretation of the language of § 4113.52. The statute reads in part:

(3) If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and if the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation

and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.

*See* Ohio Rev.Code § 4113.52(A)(1)(b)(3).

Both the Sixth Circuit and the District Court for the Northern District of Ohio have determined that to come within the statute, a plaintiff must have reasonably believed that the alleged violation at issue was (1) a criminal offense that is likely to cause either (a) an imminent risk of physical harm to persons or (b) a hazard to the public health or safety, or (2) was a felony. *See Brooks, supra;* [16] *Long v. Rhone–Poulenc Rorer Pharm., Inc.*, No. 3:98CV7037, 1999 WL 680867 at *1–2 (Feb. 23, 1999). *See also Fox v. Bowling Green*, 76 Ohio St.3d 534, 668 N.E.2d 898, 901 (1996) (discussing criminal offense which is likely to cause a hazard to public health). Thus, instead of three categories of possible violations, there are only two.

Therefore, in order to bring a whistleblower claim under the Ohio statute, Plaintiff must have reasonably believed that Tankovich's behavior constituted either (1) a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to the public health or safety, or (2) a felony.[17]

In her Memorandum Contra, Plaintiff argues that she "reasonably believed that her supervisor, Steven [sic] Tankovich was violating a federal statute as well as school board policy against sexual harassment." (Memorandum Contra at 32).

**16.** *See Brooks*, 1998 WL 739890 at *5:

The first interpretation of the statute is correct. First, it is grammatically proper. The use of "either ... or" generally indicates that a binary relationship exists between the clauses that follow either (i.e., that there are two alternatives, not three). Additionally, the word "is" is used only before the words "a criminal offense" and "a felony," it is not used before the words "a hazard." This implies that the drafter of the statute did not mean "a hazard to public health or safety" was to be an independent, third "option."

**17.** Plaintiff seems to concede this fact in her Memorandum Contra at 32. Although Plaintiff states that she "reasonably believed her supervisor's conduct was likely to cause a hazard to the public health or safety of the school environment," Plaintiff first states that she must prove that the alleged violation constitutes "a criminal offense or a felony." *See id.*

Plaintiff fails to allege that she reasonably believed Tankovich's behavior to be either a criminal offense that was likely to cause an imminent risk of physical harm to persons or a hazard to the public health or safety, or a felony. Thus, Plaintiff does not qualify for protection as a whistleblower under § 4113.52.

Even assuming, *arguendo*, that § 4113.52 does encompass the third "hazard to public health or safety" option, Plaintiff's claim still fails. In *Thatcher v. Goodwill Industries*, 117 Ohio App.3d 525, 533–34, 690 N.E.2d 1320, 1325–26 (Ohio App. 9 Dist.1997), the plaintiff, director of personnel for his employer, brought a claim under § 4113.52 alleging that he was discharged in retaliation for notifying his supervisor and the company's board of trustees of sexual harassment complaints lodged by several female employees. The complaints alleged that an employee had a "personal relationship" with one female worker, had called one female worker a "bitch," and had used "coarse language." *See id* at 534, 690 N.E.2d at 1326. The court concluded that while the alleged conduct appeared "unsavory," it was not *"clearly felonious, likely to cause an imminent threat of physical harm to anyone, or likely to cause a hazard to public health or safety." See id* (emphasis added). The court noted that the Whistleblower Act does not protect the reporting of "every form of discrimination, abuse and harassment." *See id.*

Plaintiff has failed to show that she reasonably believed Tankovich's behavior to be a criminal violation likely to cause either an imminent threat of physical harm or a hazard to public health or safety. Likewise, Plaintiff has failed to demonstrate that she reasonably believed Tankovich's behavior to be a felony. Her argument that she believed he was violating a "federal statute as well as school board policy" is insufficient, as a matter of law, to sustain her Whistleblower Act claim. Even if § 4113.52 is interpreted to include the third option of "physical harm" and

"hazard to public health or safety," Plaintiff's claim is still insufficient because she fails to show how Tankovich's behavior meets even that criteria. In short, § 4113.52 is simply not intended to cover the type of offensive conduct about which Plaintiff complained. For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED** as to this claim.

## H. Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim for intentional infliction of emotional distress against CPS.

 Under Ohio law, a plaintiff must establish the following elements in order to recover for the intentional infliction of emotional distress: (1) the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff; (2) the actor's conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; (3) the actor's actions were the proximate cause of the plaintiff's injury, and (4) the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person could be expected to endure. *See Davis v. Washington County Open Door, Home*, No. C2–98–636, 2000 WL 1457004 at *17 (S.D.Ohio Sept. 21, 2000); *Plotner v. Swanton Local Bd. of Educ.*, 85 F.Supp.2d 747, 754 (N.D.Ohio 2000); *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 6 Ohio St.3d 369, 374–75, 453 N.E.2d 666 (1983). The Ohio Supreme Court has held that a plaintiff may recover only by demonstrating that the defendant's conduct was:

so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member

of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiff must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely unconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt.

See *Yeager*, 6 Ohio St.3d at 375, 453 N.E.2d 666, 671 (1983) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Whether a defendant's conduct satisfies this high threshold is to be judged by the objective standards of the community, not by a particular plaintiff's subjective sensibilities. *See Beene v. St. Vincent Medical Ctr.*, 111 F.Supp.2d 931, 941 (N.D.Ohio 2000) (citing *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 462 N.E.2d 392 (1984)). A plaintiff must demonstrate emotional injury which is both severe and debilitating. *See Davis*, 2000 WL 1457004 at * 17.

■■■ In its motion for summary judgment, Defendant CPS argues that its conduct does not rise to the level required for Plaintiff to recover for the intentional infliction of emotional distress, and in fact, "can be characterized as no more than actions undertaken in the normal and appropriate course of the governance and administration of a school." (Motion for Summary Judgment at 44). As for Mr. Tankovich's alleged conduct, CPS concedes that it may termed as "unprofessional" and "highly inappropriate in the workplace," but argues that it cannot be classified as "outrageous." Additionally, CPS argues that even if Plaintiff can establish a prima facie case of intentional infliction of emotional distress, CPS cannot be held liable for Tankovich's conduct because he was acting outside the scope of his employment, and that as a political subdivision, it has statutory immunity from liability for common law torts under Ohio Revised Code § 2744.

With respect to CPS' actions in transferring and failing to promote her, Plaintiff acknowledges that there is an "ebb and flow that governs the transferring and promotion of employees," but argues that transferring or failing to promote an employee based on retaliatory reasons "moves the purpose to one of extreme and outrageous conduct." (Plaintiff's Memorandum Contra at 40). Plaintiff further argues that as a result of CPS's conduct, her complaints were met with indifference, she suffered "humiliation verbal abuse [sic]," and she was belittled and disciplined. (*Id.*). As to the conduct of Tankovich, for which Plaintiff argues CPS should be liable, Plaintiff bases her argument on the fact that his conduct occurred in a middle school. Plaintiff argues that "this environment just by its purpose requires a closer tolerance to appropriate moral values and of itself requires a higher standard beyond that of which is enumerated in *Retter v. Whirlpool Corp.*" (Plaintiff's Memorandum Contra at 41). She further argues that the "hostile environment was a direct affront to the notion of decency and morality especially given the fact that it occurred in a public school," and that she was "unable to reconcile this hostile work environment with general educational policy with values and principle." (Plaintiff's Memorandum Contra at 42–43). Finally, Plaintiff argues that the alleged affair was pervasive, not incidental and sufficient to create severe distress to a " 'reasonable person in the context of the prevailing sexual mores of the work environment.' " (*Id.* at 43) (citing *Harrison [sic] v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Plaintiff does not address CPS' agency or immunity arguments.

For the reasons set forth below, the Court finds that Plaintiff fails to establish a claim for the intentional infliction of emo-

tional distress. First, as Defendant CPS correctly argues, Tankovich's conduct, while highly unprofessional and inappropriate, does not rise to the level of extreme or outrageous conduct. Under Ohio law, a plaintiff must show that the alleged conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency. *See e.g., Davis,* 2000 WL 1457004 at \*17. Again, the conduct at issue is judged by the objective standards of the community, not be a particular plaintiff's subjective sensibilities. *See Beene,* 111 F.Supp.2d at 941.

Plaintiff has failed to present evidence that Tankovich's conduct was sufficiently outrageous. Although his conduct was highly inappropriate, it was not directed toward Plaintiff, and Plaintiff witnessed no sexual activity between Tankovich and Stanley. Plaintiff was forced to respond to inquiries regarding Tankovich's behavior and unavailability, and had to shoulder additional work responsibilities. Although the effects of his conduct may have made Plaintiff's job and workplace uncomfortable and unpleasant, they clearly do not rise to the level of outrageousness required to sustain a claim for the intentional infliction of emotional distress under Ohio law. Additionally, Plaintiff's argument regarding the context in which the alleged conduct occurred is inapposite. Although the context in which conduct occurs may be significant for a claim of intentional infliction of emotional distress, here the conduct was not made more egregious vis-à-vis *Plaintiff* because of the context in which it occurred, because she was not a student at the school.

As for the conduct of CPS, Defendant argues that it cannot be held liable for the intentional infliction of emotional distress based on employment decisions undertaken in the normal and appropriate course of the governance and administration of a school (Motion for Summary Judgment at 49). In response, Plaintiff argues that otherwise appropriate personnel decisions can give rise to a claim for the intentional

infliction of emotional distress when they are motivated by discriminatory or retaliatory purposes.

Under Ohio law, an adverse employment action, "even if based upon discrimination," does not amount to extreme and outrageous conduct without "proof of something more." *See Godfredson v. Hess & Clark, Inc.,* 173 F.3d 365, 376 (6th Cir.1999) (plaintiff who failed to allege any facts beyond those supporting his age discrimination claim did not establish a claim for emotional distress); *Cameron v. Bd. of Educ.,* 795 F.Supp. 228, 238 (S.D.Ohio 1991) (plaintiff's only basis for emotional distress claim, that she "may have been dismissed for discriminatory reasons" was insufficient to establish claim); *Hawley v. Dresser Industries, Inc.,* 737 F.Supp. 445, 469 (S.D.Ohio 1990) ("the mere unjustifiable nature of a termination does not make it extreme and outrageous") *overruled on other grounds, Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1042 (6th Cir.1992). *See also Gudenkauf v. Stauffer Communications, Inc.,* 922 F.Supp. 461, 464 (D.Kan. 1996) ("Nor does adding the fact that the employer acted on an unlawful discriminatory motive make the act of termination extreme or outrageous ... [e]mployment discrimination by itself, without aggravating factors like ethnic slurs and physical threats does not amount to outrage") (citations and quotations omitted); *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54, 41 Tex. Sup.Ct. J. 930 (1998) (termination in retaliation for reporting sexual harassment did not establish extreme and outrageous conduct under Texas law).

Plaintiff has failed to establish that CPS' conduct was extreme and outrageous. Even if CPS transferred or failed to promote Plaintiff for discriminatory or retaliatory reasons, it does not follow that its actions were sufficiently outrageous for Plaintiff's claim. Without additional evidence that CPS acted outrageously, Plaintiff's claim must fail. *See Cameron,* 795 F.Supp. at 238.

In addition to the affirmative conduct of an employer, "inaction by an employer ... in the face of continuous, deliberate, degrading treatment of another may rise to the level of intentional infliction of emotional distress." *See Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933, 947 (6th Cir.2000) *petition for cert. filed,* 69 U.S.L.W. 3365 (U.S. Nov. 13, 2000) (No. 00–763). Although Plaintiff has presented evidence of CPS' inaction after it had knowledge of Tankovich's conduct, Plaintiff has not shown that the treatment she experienced was so egregious that by its inaction CPS should be held liable for the intentional infliction of emotional distress.

Even if discriminatory or retaliatory, CPS' actions of transferring and failing to promote Plaintiff do not rise to the level of extreme and outrageous conduct required under Ohio law. Nor does CPS' inaction rise to the level of intentional infliction of emotional distress, because Tankovich's behavior was not sufficiently egregious to impose liability upon CPS for inaction.

Although Plaintiff has presented evidence of the extreme emotional distress she has suffered, the conduct which has caused her distress does not rise to the level of outrageousness required for this claim when judged objectively. Instead, Plaintiff may be overly sensitive to conduct, which although distasteful and unprofessional, was not extreme and outrageous, nor directed at Plaintiff. The Court finds that Plaintiff has failed to establish a prima facie case of intentional infliction of emotional distress under Ohio law. In light of this conclusion, the Court need not address Defendant's agency and statutory immunity defenses. The Court **GRANTS** Defendant's motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

## I. Husband's Claims

Plaintiff's husband brings claims for loss of consortium and the intentional infliction of emotional distress against CPS.

### 1. Loss of Consortium

Under Ohio law, a spouse has a cause of action for loss of consortium against a person who tortiously injures that person's spouse. *See Clouston v. Remlinger Oldsmobile Cadillac, Inc.*, 22 Ohio St.2d 65, 75, 258 N.E.2d 230, 235 (1970). Although a loss of consortium claim is derivative, "in that it is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury," it is also considered to be "legally separate and independent form the claim of the spouse who suffered the bodily injury." *See Bowen v. Kil–Kare, Inc.*, 63 Ohio St.3d 84, 93, 585 N.E.2d 384, 392 (1992). Thus, because the claim is separate and independent, the spouse claiming loss of consortium must provide evidence of his own injury beyond that of his spouse. *See Richard v. Wal-Mart Discount Stores,* No. 98 CA 48, 1999 WL 812303 at *8 (Ohio App. 2 Dist.1999).

Mr. Black's loss of consortium claim has three fatal flaws. First, Mr. Black's consortium claim is derivative of Plaintiff's tort claim for the intentional infliction of emotional distress. Thus, because Plaintiff has failed to establish her tort claim for emotional distress, Mr. Black cannot pursue this derivative claim. *See e.g., Lemaster v. Davis,* No. 95–CA–30, 1996 WL 174627 at *5 (Ohio App. 4 Dist. 1996) ("while a spouse's claim for loss of consortium is separate and distinct, the non-injured spouse cannot recover for loss of consortium if there is no cognizable claim under Ohio law that would be available to the injured spouse"). Second, even assuming Plaintiff could establish a primary claim upon which Mr. Black could base his consortium claim, Ohio courts have "repeatedly held" that the term "bodily injury" does not include non-physical harms such as emotional distress. *See Morgan v. Enterprise Rent-A-Car,* No. 98–T–0103, 2000 WL 523085 at *6 (Ohio App. 11 Dist.2000) (citing *Tomlinson v. Skolnik,* 44 Ohio St.3d 11, 14, 540 N.E.2d 716 (1989)). Plaintiff, however, has not

alleged any "bodily injury," and thus Mr. Black cannot maintain a claim for loss of consortium. Finally, assuming Plaintiff could establish a primary claim, and assuming that she could allege sufficient "bodily injury," Mr. Black has presented no evidence that he suffered any injury of his own beyond that suffered by Mrs. Black. Therefore, the Court **GRANTS** Defendant's motion for summary judgment on Mr. Black's loss of consortium claim.

### 2. Intentional Infliction of Emotional Distress

As for Mr. Black's claim for the intentional infliction of emotional distress, Defendant is likewise entitled to summary judgment. Although Mr. Black's claim for intentional infliction of emotional distress may be "less derivative" of Plaintiff's claim than is his claim for loss of consortium, it is still based on the actions of Defendant taken toward Plaintiff. Mr. Black has presented no evidence to support his claim for intentional infliction of emotional distress, and probably cannot do so, given that Plaintiff herself cannot maintain a claim for the intentional infliction of emotional distress. The Court **GRANTS** Defendant's motion for summary judgment on Mr. Black's claim for intentional infliction of emotional distress.[18]

### CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment (Record 31) is **GRANTED IN PART** and **DENIED IN PART**. The motion is denied as to Mrs. Black's Title VII retaliation claim regarding her transfer to Yorktown Middle School.

**IT IS SO ORDERED.**

---

**18.** As the Court grants Defendant's motion for summary judgment, it need not address Defendant's statutory immunity defense.